Annette **BELL**, By her next friend, Dianne **Rubin**, Individually and on behalf of all persons alleged to be mentally ill who are similarly situated, Plaintiffs,

v.

**WAYNE COUNTY GENERAL HOSPITAL AT ELOISE** et al., Defendants.

Gloria A. **DALIMONTE**, Individually and on behalf of all persons similarly situated who are or who are about to be involuntarily committed or detained in state public institutions through civil commitments as persons alleged to be mentally ill without findings that they are dangerous to themselves or others, Plaintiff,

v.

The **PROBATE COURT FOR the COUNTY OF CHIPPEWA** et al., Defendants.

Civil Action No. 36384.

United States District Court, E. D. Michigan, S. D.

May 31, 1974.

Alan W. Houseman, Gabe Kaimowitz, Michigan Legal Services, Detroit, Mich., for plaintiff Bell.

William S. Easton, Upper Peninsula Legal Services, Marquette, Mich., for plaintiff Dalimonte.

Milton I. Firestone, Asst. Atty. Gen., Lansing, Mich., for defendant Attorney Gen., State of Michigan.

George H. Cross, Corp. Counsel, Detroit, Mich., for defendant Wayne County.

William H. Dance, Detroit, Mich., for Mich. Psychiatric Society (Intervening).

John C. Frakes, Jr., Matheny, Schureman, Frakes & Glass, Detroit, Mich., for doctors in Bell case (defendants.)

Before McCREE, Circuit Judge, FOX, Chief District Judge, and FEIKENS, District Judge.

## OPINION

FOX, Chief District Judge.

The plaintiffs in these consolidated actions seek summary judgment declaring unconstitutional and enjoining the operation of M.C.L.A. §§ 330.21 and 330.54 (M.S.A. §§ 14.811 and 14.844),[1] provisions which set forth the standards and procedures for the adjudication, involuntary civil commitment and treatment of persons alleged to be mentally ill.

These cases were brought under 42 U.S.C. § 1983, providing redress for the deprivation under color of state law, of rights, privileges and immunities secured by the Constitution and laws of the land to all citizens and others within the jurisdiction of the United States. Jurisdiction is based upon 28 U.S.C. § 1343(3) and (4). The power to grant declaratory and further relief arises from 28 U.S.C. §§ 2201 and 2202. With due regard for the substantial constitutional issues raised as grounds for enjoining these state statutes, the three-judge court was convened pursuant to 28 U.S.C. §§ 2281 and 2284.

Plaintiffs contend that certain procedures and standards which M.C.L.A. §§ 330.21 and 330.54 provide for the extended involuntary commitment and treatment of persons alleged to be mentally ill violate due process of law, and that to commit and treat such persons as permitted by these provisions amounts to cruel and unusual punishment. Plaintiffs attack the validity of each provision on its face and not as applied to them in particular.

While the history of each plaintiff's exposure to the Michigan civil commitment process is not at issue here,[2] we may note that both Annette Bell and Gloria Dalimonte have experienced the rigors of that system on repeated occasions. Although neither plaintiff has ever been finally adjudicated mentally ill they have been held for extended periods of time under temporary orders. Throughout the proceedings by which they initially were confined, neither was informed of a right to counsel or to jury, although each eventually obtained free legal services without assistance from the detaining legal and medical authorities. Neither was told of the factual allegations upon which her commitment was based. Hearings were held at which plaintiffs were not present. During periods of confinement each plaintiff has been subjected to treatment against her will, plaintiff Bell to chemo or drug therapy, plaintiff Dalimonte to electroshock therapy. The nature of

---

1. These provisions constitute sections 11 and 44 of Act No. 151, Public Acts of 1923, as amended. This broad-ranging act encompasses a variety of substantive, procedural and administrative provisions relating to problems of mental disease in contexts both civil and criminal. Only certain aspects of the civil commitment process are at issue here.

2. Each plaintiff also seeks damages against the individuals and institutions involved in

her specific experience under the civil commitment process. The damage claims and attendant factual questions are not before us. The three-judge court was convened solely for the purpose of resolving the constitutional issues raised by the plaintiffs' motion for summary judgment. The damage claims shall be tried by the individual district judges before whom these cases originally arose.

proceedings which lead to such instances of confinement, the forms of involuntary treatment allowed to be administered to persons so confined and the definition of "mental illness" which serves as a standard for commitment are subject of the present controversy.

### I. The Civil Commitment Process.

The Michigan civil commitment scheme provides for three distinct forms of involuntary commitment. The first, which we may designate emergency detention, comprehends several alternative procedures set forth in M.C.L.A. § 330.-19 (M.S.A. § 14.809). These procedures function before commencement of formal commitment proceedings under M.C.L.A. § 330.21. In general they allow immediate apprehension and detention for periods of either 5 days or 48 hours, applying standards which require the presence of an element of danger to self or to others.[3] In no manner do plaintiffs challenge the constitutionality of these provisions.

The second form we shall term temporary commitment. This form comprehends two provisions of M.C.L.A. § 330.-21 which operate after commitment proceedings have been initiated but before a final adjudication of mental illness. Each allows detention for a period as long as 120 days; they may be invoked consecutively, producing a period of detention totalling 240 days without final adjudication. These provisions are central targets of attack.

The third form of commitment is indefinite commitment ordered after a final determination of mental illness, M.C.L.A. § 330.21. Plaintiffs do not challenge this ultimate phase of the process. However, since the commitment process is constructed as a single, all-embracing scheme, many of the procedural facets they attack are common to proceedings for both temporary and indefinite commitment, and the standard of commitment for mental illness informs, at bottom, determinations made in all phases of the process.

The relevant portions of M.C.L.A. §§ 330.21 and 330.54 are reproduced in the appendix.

### II. Procedural Due Process: General Issues.

#### A. Initiation of the Process: Notice to Respondents.

Under M.C.L.A. § 330.21, the commitment process is initiated by a petition filed in probate court praying for an order of commitment, alleging that the individual sought to be committed is mentally ill and stating the facts upon which the allegation of mental illness is based. The petition may be filed by a family member, a guardian, certain local public officers, or any other person approved by the probate judge. When it receives such a petition, the court must schedule a date for the commitment hearing and appoint two physicians to examine the respondent and to file their report with the court at or before the hearing. Regarding notice to the respondent, the statute provides:

"Notice *of such* petition and of the time and place of hearing thereon shall be served personally, at least 24 hours before the hearing, upon the person alleged to be so mentally diseased. . . ." M.C.L.A. § 330.21. (Emphasis supplied.)

The statute at no point directs that the respondent be served the petition itself,

---

3. The 5-day limit applies in cases of judicially authorized detention, where it appears to a probate or circuit judge that confinement of a person believed to be mentally ill is "necessary and essential to public safety," and also in cases where detention is authorized by an official city or county physician who finds that a person is mentally ill and that his immediate detention is "necessary for public safety or the safety of the individ-ual." In all such cases the 5-day limit may be extended by special order of the probate court. The 48-hour limit applies where, on his own initiative, a peace officer confines a person believed to be mentally ill and "manifesting homicidal or other dangerous tendencies," and obtains approval of the prosecuting attorney within 24 hours of the taking into custody. M.C.L.A. § 330.19.

or a copy thereof. Not having received the petition, the respondent remains unaware of the factual bases upon which his mental illness is alleged until the hearing is in progress.

■■ In the case of In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court addressed the requirements of due process in the context of delinquency proceedings which, although denominated "civil," held the prospect of incarceration in a state institution for juveniles adjudged delinquent. The Court held that, to comply with the mandate of due process, notice to the child and his parents must inform them of the specific allegations to be raised at hearing and must be given at the earliest practicable time, in any event sufficiently in advance of the hearing to permit preparation. 387 U.S. at 33, 87 S.Ct. 1428. The Court drew no distinction between juvenile delinquency and adult criminal proceedings in respect of the demands of due process, recognizing that the potential loss of freedom is common to both. The principle of Gault applies equally to the civil commitment process. The fundamental right to liberty is at stake in a civil commitment hearing no less than in a criminal trial or juvenile proceeding. Due process requires the same adequate and timely notice in all such proceedings. Lessard v. Schmidt, 349 F.Supp 1078, 1092 (E.D.Wis.1972) ; [4] see also, Heryford v. Parker, 396 F.2d 393 (10th Cir. 1968). In Michigan a respondent's failure to counter the allegations lodged against him portends, at best, confinement which may continue 60 days.[5] Where his failure is the product of notice received on the eve of hearing and

devoid of the issues he must confront, due process of law has been breached.

■ Defendants would have us interpret the Michigan notice provision as to require service of the petition itself. Were it feasible to construe the statute in this manner we would do so and avoid a finding of invalidity. But by no means of reasonable construction could we read the phrase "[n]otice of such petition and of the time and place of hearing shall be served" as if written "such petition and notice of time and place of hearing shall be served." Michigan law tells us: "All words and phrases shall be construed and understood according to the common and approved usage of the language." M.C.L.A. § 8.3a (M.S.A. § 2.212(1)). The notice provision as enacted imports, in addition to notice of the time and place of hearing, only notice that a petition has been filed.

■ We find M.C.L.A. § 330.21 violative of due process of law insofar as it fails to require notice including the petition itself to be served sufficiently in advance of hearing to permit preparation.

*B. Right to Counsel.*

■ Just as adequate notice is fundamental to the validity of the civil commitment process, so is the right to counsel of paramount importance. In Gault, supra, the Supreme Court recognized that a juvenile accused in delinquency proceedings "needs the assistance of counsel to cope with the problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it." 387 U.S. at 36, 87 S.Ct. at 1448.

4. In Lessard the three-judge court declared unconstitutional and enjoined the Wisconsin civil commitment laws. Because of its similarity to the case now before us, we shall have frequent occasion to refer to Lessard in the course of this opinion. It must be noted that in Schmidt v. Lessard, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661, decided January 14, 1974, the Supreme Court vacated the judgment of the District Court for failure of the injunctive order to comply with the specificity requirements of Rule 65(d) of the Federal Rules of Civil Procedure, and remanded the case for appropriate further proceedings. In the course of its ruling the Supreme Court intimated no view on the merits as to the resolution of constitutional issues in the District Court opinion.

5. See part IV, B infra.

Gault held that due process requires in respect of delinquency proceedings that the child and his parents be notified of the child's right to be represented by counsel and that if they are financially unable to retain counsel, appointed counsel will be provided. 387 U.S. at 41, 87 S.Ct. 1428. The Tenth Circuit in Heryford v. Parker, supra, extended the theme of Gault to the civil commitment context:

"[L]ike Gault, and of utmost importance, we have a situation in which the liberty of an individual is at stake, and we think the reasoning in Gault emphatically applies. . . .
Where, as in both proceedings for juveniles and mentally deficient persons, the state undertakes to act in parens patriae, it has the inescapable duty to vouchsafe due process, and this necessarily includes the duty to see that a subject of an involuntary commitment proceedings is afforded the opportunity to the guiding hand of legal counsel at every step of the proceedings . . . . [It is not] sufficient that the [commitment] statute permissively provides that the proposed patient 'may be represented by counsel'. Fourteenth Amendment due process requires that the infirm person, or one acting in his behalf, be fully advised of his rights and accorded each of them. . . ." 396 F.2d at 396.

See also Lessard v. Schmidt, supra, 349 F.Supp. at 1097–1098; Dixon v. Attorney General of Comm. of Pennsylvania, 325 F.Supp. 966 (M.D.Penn.1971); Denton v. Commonwealth, Ky., 383 S.W.2d 681 (1962). In agreement with the rationale of these cases we hold that a respondent has the right to legal counsel and, if indigent, to appointed counsel, to assist him at every step of the commitment proceedings; and further that he must be notified of this right at the outset of the proceedings.

Defendants contend that the Michigan civil commitment laws adequately provide for the right to counsel, and in support thereof refer to the ruling of the Michigan Supreme Court in In re Wojtasiak, 375 Mich. 540, 134 N.W.2d 741 (1965). Wojtasiak cannot be deemed controlling here because it did not speak to the general civil commitment provisions which plaintiffs attack; rather, it dealt with a petition for writ of habeas corpus arising out of a specific proceeding for the recommitment of a criminal patient after expiration of his sentence, a matter governed by M.C.L.A. § 330.68, M.S.A. § 14.856, and simply ordered that the petitioner in that case be represented by appointed counsel upon rehearing, without deciding even in that context whether appointed counsel was a matter of statutory right.[6]

■ Defendants also rely upon the provision in M.C.L.A. § 330.21 regarding appointment of a guardian ad litem:

"In such cases [where substituted service [7] is directed] the court shall appoint a guardian ad litem to represent such alleged mentally diseased person upon such hearing, and in other cases it may appoint such guardian ad litem."

We cannot accept that this provision sufficiently affords the right to counsel in commitment proceedings. Since substituted service has been abolished, the appointment of a guardian ad litem is discretionary in all cases under the provision's explicit terms. Further, nothing in Michigan law requires the guardian ad litem to be an attorney. The right to counsel implies the right to representation by legally trained and qualified counsel. A layman cannot properly fulfill this role. In this regard, see

6. "[A]ppointed counsel shall represent petitioner *and* all rights of petitioner now granted under our present statute shall be afforded to said petitioner at rehearing." Wojtasiak, supra, 375 Mich. at 545, 134 N.W.2d at 743. (Emphasis supplied.)

7. Under Michigan's recently enacted Probate Court Rules, substituted service is prohibited. PCR 105.3(1).

Morris and Luby, "Civil Commitment in a Suburban County: An Investigation by Law Students," 13 Santa Clara Lawyer, 518 at 529-530 (Spring, 1973), a study of the operation of the civil commitment process in Oakland County, Michigan. Also, Lessard v. Schmidt, supra, indicates that even where an attorney is appointed guardian ad litem, his representation of the prospective patient may be inadequate since in these circumstances he usually sees his role not as defense counsel but as a traditional guardian who determines for himself what is in the best interests of his ward and proceeds on that basis, virtually disregarding the latter's will. 349 F.Supp. at 1098-1099.

■ For these reasons we find that M.C.L.A. § 330.21 fails to satisfy the due process requirement that persons alleged to be mentally ill be afforded full opportunity for representation by counsel, including notice of the right to appointed counsel.

### C. Presence at Hearings.

M.C.L.A. § 330.21 provides:

"Such alleged mentally diseased person shall have the right to be present at such hearing, unless it shall be made to appear to the court, either by the certificate of the medical superintendent in charge of such hospital, home or retreat to which he may have been temporarily admitted, or by certificate of 2 reputable physicians, that his condition is such as to render his removal for that purpose, or his appearing at such hearing improper and unsafe."

■ Because, as discussed above, the threat to liberty is common to both civil commitment and criminal proceedings, the due process right of a respondent to be present at commitment hearings is at least as broad as the right of a criminal defendant to be present at trial. Under Illinois v. Allen, 397 U.S.

337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) a criminal defendant may be removed from trial where his conduct is so disruptive that the proceeding cannot continue in any reasonable manner. In our view a respondent may be removed from commitment proceedings under similar circumstances, but to exclude the respondent as provided above violates due process. "The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same purpose." Shelton v. Tucker, 364 U.S. 479 at 488, 81 S.Ct. 247, at 252, 5 L.Ed.2d 231 (1960). While a committing court may exclude a respondent where his presence makes it impossible to reasonably conduct the hearing, it may not decide in advance of hearing and based solely on the certificate of physicians, that he shall not be allowed to appear. Where his removal to the courthouse would be "improper and unsafe," some method alternative to total exclusion must be attempted first, such as conduct of the proceedings at the mental health facility. Because the above provision does not require a court to attempt any such alternative method before deciding to proceed in the absence of a respondent, it violates due process of law.

### D. The Right to Jury Trial.

■ M.C.L.A. § 330.21 provides that a jury shall be empaneled to determine the question of mental illness when a respondent so demands. It is silent as to a requirement that respondents be informed of their right to demand a jury. Plaintiffs claim that the statute is unconstitutional because it does not include this requirement, referring to Lessard v. Schmidt, supra, as supporting authority. Lessard stated that a patient "should be informed" of his right to jury trial, 349 F.Supp. at 1092.

An adequate notice should likewise inform respondent of one's statutory right to trial to a jury.

*III. Standard of Commitment for Mental Illness.*

Plaintiffs challenge the definition of mental illness employed as a standard [8] for civil commitment under M.C.L.A. § 330.21. M.C.L.A. § 330.54 defines mental illness:

> " '[M]entally ill' or 'mentally ill person' as used in this act, include every species of insanity and extend to every mentally deranged person, and to all of unsound mind, other than mentally handicapped, epileptics, and persons who manifest the general deterioration of mental processes, including disorientation, confusion or impairment of memory, associated with senility, but without psychotic implications."

Plaintiffs attack this standard as impermissibly vague and overbroad and further allege that to involuntarily commit persons solely by reference to such a standard amounts to cruel and unusual punishment. The basic postulate of these challenges is that a state may not deprive a person of liberty on grounds of mental illness unless, because of such mental illness, he presents a danger to himself or to others. Defendants do not contest this principle. They contend that the State of Michigan has no interest in committing a person where such an element of danger is not present, [9] and would have us read an inherent concept of dangerousness into the overall scheme of the act.

Defendants do not attempt to trace this concept to the definition of mental illness itself, and in our view they could not. By the terms of that definition virtually any mental disorder would qualify, including many which, although unfortunate, could not be classified as other than harmless.[10] The only provision to which they do refer is M.C.L.A. § 330.35a (M.S.A. § 14.825(1)):

> "The medical superintendent may discharge any patient whose discharge in the judgment of the superintendent shall not be detrimental to the public nor the patient because of mental disease."

However, since this provision merely empowers and does not require the superintendent to release such persons, it implies that he likewise may refuse to exercise that authority, i. e., some patients whose discharge he judges would "not be detrimental to the public nor the patient because of mental disease" may be detained. In reality the act draws an express distinction between this condition of detriment to others or to self and the condition of mental illness, for the preceding section *requires* the superintendent to discharge patients he finds not mentally ill. M.C.L.A. § 330.35(4) (M.S.A. § 14.825(4)).

---

8. Michigan employs three standards for civil commitment: Mental illness, mental handicap and epilepsy, collectively referred to by the term "mental disease." M.C.L.A. §§ 330.21, 330.54. Plaintiffs challenge only the mental illness standard.

9. "The State defendants concede, moreover, that the State of Michigan has no interest under the police power in committing any person to a State institution on account of mental illness unless such person, if not so committed, would constitute a menace to the public safety or to society or a danger to themselves." Defendants' Stipulation, Proposed Findings and Brief, p. 3. This statement is reiterated in defendants' final brief, p. 19.

10. The medical profession recognizes numerous mental disturbances of this order. Amicus American Orthopsychiatric Association directs us to the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association (2nd Ed. 1968), a standard medical definitional source. One category of mental disorders described in the volume is referred to as "Personality Disorders." A subtype in this category is the "Obsessive-Compulsive Personality," characterized by "excessive concern with conformity and adherence to standards of conscience," p. 43. Another is the "Passive-Aggressive Personality," in which "[t]he aggressiveness may be expressed passively, for example by obstructionism pouting, procrastination, intentional inefficiency, or stubborness," pp. 43–44. Tension headaches or impotence will be considered mental illnesses if "emotional factors play a causative role," p. 47.

The judgmental formulas of M.C.L.A. § 330.21 evidence that nothing more than a finding of mental illness within the above definition is required for issuance of an order for indefinite commitment,[11] and that something less will suffice to require an order of temporary commitment for diagnosis and intensive treatment.[12] As regards temporary detention, putting aside for the moment the question of procedural sufficiency, M.C.L.A. § 330.21 provides that an order temporarily detaining a person alleged to be mentally ill may be entered when it appears "necessary and essential so to do." At first glance this language seems to imply that an element of potential harm or danger is required, but reading on, nowhere is it stated *why* the detention is necessary and essential. Upon comparison with the language of the emergency detention provisions in M.C.L.A. § 330.19, it becomes clear that when the act requires the presence of a threatening condition it says so plainly, and distinguishes by nature and degree.[13]

Thus, we must conclude that in M.C.L.A. § 330.21 and § 330.54, the Michigan act sets forth a process under which a person whose affliction, in the view of a given court, falls anywhere within a vast, uncontoured description of mental ills, is subject to both temporary and indefinite commitment, whether his particular ill presents a realistic threat of harm to himself or to others. In our opinion, the standard of commitment for mental illness is fatally vague and overbroad.

We believe that in the dictum reference to the Wisconsin standard,[14] the Supreme Court in Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), implied the constitutionally proper norm for civil commitment:

> "Wisconsin conditions such confinement not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty." 405 U.S. at 509, 92 S.Ct. at 1052.

Thus, to validate the "massive curtailment of liberty" which involuntary commitment occasions, the basis for confinement must lie in threatened or actual behavior stemming from the mental disorder, and of a nature which the state may legitimately control, viz., that causing harm to self or to others. Cf. Dixon v. Attorney General of Comm. of Pa., 325 F.Supp. 966, 975 (M.D.Pa.1971), Anderson v. Solomon, 315 F.Supp. 1192, 1194–1195 (D.Md.1970). The Lessard court espoused as constitutional doctrine the standard suggested in Humphrey, 349 F.Supp. at 1093. It, like the Supreme Court drew such a limited standard from the Wisconsin definition and avoided a finding of invalidity. We are unable to so construe the Michigan definition, given its references to "every species of insanity" and "all of unsound mind." There are few visible limits here to guide court or citizen.[15]

---

11. "If such person shall be found and adjudged to be mentally ill . . . the court may issue an order for his admission to the proper hospital, home or institution. . . ." M.C.L.A. § 330.21.

12. See part IV, B, infra.

13. "[N]ecessary and essential to public safety" (detention by judicial order); "necessary for public safety or the safety of the individual" (detention initiated by official physician); "manifesting homicidal or other dangerous tendencies" (detention initiated by peace officer). M.C.L.A. § 330.19

14. " 'Mental illness' means mental disease to such extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community." Wisc.Stat.Ann. § 51.75, Art. II(f).

15. Defendants in effect argue that a standard in terms of dangerousness is also imprecise. We agree. It is, as Lessard, supra, noted, a question of degree and of balancing. 349 F.Supp. at 1093. However a formulation which somehow imports a need for treatment to stem a realistic threat of harm, at least focuses deliberation along proper lines.

*IV. Temporary Commitment.*

██ American jurisprudence early recognized the tenet that detention of the mentally ill must be shaped and controlled by its reasonable objectives. "The restraint can continue as long as the necessity continues. This is the limitation and the proper limitation." Matter of Oakes, 8 L.Rep. 123 (Sup.Jud.Ct. Mass.1845). In Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the Supreme Court affirmed the constitutional dimension of this principle: "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." 406 U.S. at 738, 92 S.Ct. at 1858. We must examine the Michigan temporary commitment provisions against this background.

*A. Temporary Detention.*

Plaintiffs first challenge the temporary commitment procedure in M.C.L.A. § 330.21, which provides:

"Pending such proceedings for admission into the proper home, hospital or institution, if it shall appear, upon the certificate of 2 legally qualified physicians, who need not be appointed by the probate court and who may be attending physicians in any institution to which it is proposed to admit such mentally diseased person, to be necessary and essential so to do, the court may order such alleged mentally diseased person to be placed in the custody of some suitable person, or to be removed to any hospital, home or retreat, to be detained until such petition can be heard and determined or to be removed to any state hospital for the mentally diseased or licensed hospital for custody and treatment. The period of such temporary detention shall not exceed 60 days, which period may be extended up to an additional 60 days by special order of the court upon request of such alleged mentally diseased person, or of his father, mother, husband or wife, or of his child or other next of kin, if of full age, or of the superintendent [in charge] of any hospital to which such person was removed by order of the court."

██ Plaintiffs admit that immediate detention without a previous hearing of persons who present a danger to themselves or to others, is justified. However, they contend that the above provision violates due process of law in allowing extended confinement by probate court order without a hearing on the necessity of detention.

Lessard v. Schmidt, supra, involved a similar challenge to the Wisconsin civil commitment scheme. Under the Wisconsin statutes persons could be held for as long as 145 days without hearing in certain circumstances. The three-judge court could not condone this egregious delay, and found even much shorter time periods constitutionally impermissible:

"Clearly, involuntary confinement in a mental institution for 16 or 26 days is a significant deprivation of liberty, and one which cannot be permitted under our Constitution without a hearing.

"It can be argued that no deprivation of liberty is permissible under the due process clause without a prior hearing. We think, however, that the state may sometimes have a compelling interest in emergency detention of persons who threaten violence to themselves or others for the purpose of protecting society and the individual. Cf. Boddie v. Connecticut, supra, 401 U.S. [371] at 377–378, 91 S.Ct. 780 [28 L.Ed.2d 113]. Such an emergency measure can be justified only for the length of time necessary to arrange for a hearing before a neutral judge at which probable cause for the detention must be established." 349 F.Supp. at 1091.

The Lessard court held that a person may be detained no longer than 48 hours without a preliminary hearing at which he is present and is represented by counsel, or by appointed counsel if he is indigent, and which is preceded by adequate

notice of the time and place of the hearing, and the nature of the grounds and necessity for confinement.

In re Barnard, 147 U.S.App.D.C. 302, 455 F.2d 1370 (1971), likewise spoke to the hearing requirement:

"[W]here a person, said to be mentally ill and dangerous, is involuntarily detained, he must be given a hearing within a reasonable time to test whether the confinement is based upon probable cause. . . . When personal freedom is at issue due process at least demands that a person's legal status be determined at the earliest possible time." 455 F.2d at 1374, 1375.

See also Anderson v. Solomon, 315 F. Supp. 1192 (D.Md.1970).

Plainly, the Michigan temporary detention provision, allowing persons to be held for up to 60 days by court order based solely on the certification of two physicians that detention is "necessary and essential" and further allowing the court to extend the time period for an additional 60 days upon the simple request of a family member or hospital superintendent, does not comport with the minimum dictates of due process. These summary, ex parte procedures cannot legitimize confinement for such protracted periods as 60 or 120 days. We hold that a person believed to be mentally ill may not be involuntarily detained without prompt preliminary hearing. We do not specify the precise length of time a person may be confined before an initial hearing must be held; however, the limit of 5 days prescribed in the emergency detention provisions, M.C.L.A. § 330.19, appears to be appropriate.

The purpose of such preliminary hearing is to determine whether there is probable cause to believe that confinement is necessary under constitutionally proper standards for commitment as discussed above.[16] Due process does not require that the preliminary

hearing be as formal and comprehensive as subsequent proceedings for final adjudication. Cf., Boddie v. Connecticut, 401 U.S. 371 at 378, 91 S.Ct. 780 (1971), Lessard v. Schmidt, supra, 349 F.Supp. at 1091–1092. However, at the very least, the hearing must be preceded by an adequate notice informing a person of the nature of the grounds, reasons and necessity for such confinement; that the confined person be present at the hearing and represented by a lawyer, unless there is a knowledgeable waiver of right to counsel. Such a person must be afforded a meaningful opportunity to rebut allegations that his confinement is lawfully required. If probable cause is then established, he may be detained for a reasonable time until a full hearing can be held.

### B. Temporary Commitment for Diagnosis and Intensive Treatment.

M.C.L.A. § 330.21 sets forth a second temporary commitment procedure in the following provision:

"The court shall . . . take proofs as to the alleged mental condition . . . of such person, and fully investigate the facts, and, if no jury is requested, the probate court shall determine the question of such alleged mental disease of such person. If it shall appear to the court or jury from evidence contained in the doctors' certificates, the psychiatric report or from evidence produced in court *that such person is mentally diseased, but that the degree of mental disease does not warrant final adjudication and commitment or that a limited period of intensive treatment may make final adjudication and commitment unnecessary* or if prior to the taking of any proof the alleged mentally diseased person or his attorney so demands, the court shall order such person to be removed to a regional diagnostic treatment center for diagnosis, care and intensive treatment for a period not to exceed 60 days, which

16. Part III.

period may be extended up to an additional 60 days by special order of the court upon request of the superintendent of the regional diagnostic and treatment center." (Emphasis supplied.)

Unlike the temporary detention procedure discussed in the preceding section, here the order of temporary commitment for diagnosis and intensive treatment is entered after a hearing has been held and a finding of mental illness has been made. Nonetheless, this procedure is infected by the overall failure of the act to provide adequate notice, full implementation of the right to counsel and all possible means to insure the presence of tne respondent at commitment proceedings, as discussed above, and to that extent we find it violative of due process of law. Further, the standard applied here for temporary commitment, to the extent it relies upon some lesser degree of mental disorder than would "warrant final adjudication," is even more objectionable than the basic standard of mental illness as defined in M.C.L.A. § 330.-54.[17]

## V. Involuntary Treatment During Temporary Commitment.

Under the pre-hearing detention provision of M.C.L.A. § 330.21 a person may be held in a state hospital for 120 days for "custody and treatment." Under the temporary commitment provision of this section, a person may be removed for the same period to a regional diagnostic and treatment center for "diagnosis, care and intensive treatment." Plaintiffs contend that as permitted in these provisions, the involuntary treatment of persons temporarily committed or detained in public hospitals is unconstitutional. Specifically they allege that when these persons are treated against their will by methods which extend to chemotherapy or electroshock therapy, physically intrusive forms of treatment designed to alter or modify a person's behavior, "treatment" becomes cruel and unusual punishment.

Despite the seemingly clear statutory language, defendants maintain that these provisions do not authorize treatment of persons temporarily committed or detained. In so arguing they rely upon the Michigan Supreme Court decision in Stowers v. Wolodzko, 386 Mich. 119, 191 N.W.2d 355 (1971), and an opinion of the state attorney general, II OAG, 1955–1956, No. 2847, p. 693 (Nov. 26, 1956). Analysis of these sources leads to the opposite conclusion, that treatment during either period of temporary commitment is authorized in public hospitals.

Stowers, supra, was an action for damages in which the plaintiff sought recovery for treatment administered against her will during pre-hearing detention in a *private* hospital. The Supreme Court held that the physician who directed the forced treatment could be held liable therefor because the pre-hearing detention provision does not authorized treatment in a *private* hospital. More instructive for our purposes however, the court explicitly recognized the statutory distinction between private and public hospitals in this respect:

"Under the statute a clear distinction is made between referral to *a State hospital where custody and treatment are authorized,* and a private hospital where a patient is only to be 'detained until such petition can be heard and determined.' If we were to accept defendant's contention that there is no distinction between private and State hospitals, we would be avoiding the clear meaning of the statute and treating a part of the statute as surplusage." 386 Mich. at 134, 191 N. W.2d at 362. (Emphasis supplied.)

Defendants' second authority, the attorney general's opinion, did indicate that the other provision we consider here, regarding temporary commitment, did not authorize treatment:

"Prior to final adjudication by the court, any treatment given without consent of the patient, other than that

. Part III.

necessary to keep him on the premises and to prevent his injuring himself or others, is given at the peril of the superintendent, and may give rise to liability for assault or for trespass." II OAG, 1955–1956, No. 2847, p. 693 at 694.

 At the time of this ruling the language of the newly-enacted temporary commitment provision stated that removal of patients to regional diagnostic and treatment centers was to be for "diagnosis, care and treatment." P.A. 1956, No. 159, § 1.[18] Within a matter of months after this interpretation was rendered, the Michigan legislature amended the critical language to its present form, "diagnosis, care and *intensive treatment*," P.A.1957, No. 313, § 1,[19] to take effect immediately. Thus not only the manifest language of the statute, but also clear indications from the legislature and the state's highest court compel the conclusion that involuntary treatment is authorized in public hospitals during both pre-hearing detention and temporary commitment.

The term "treatment" is undefined in the act, thus its scope is potentially unlimited.[20] On the face of the statute, the clear implication arises that persons temporarily committed or detained under M.C.L.A. § 330.21 may be subjected against their will to physically intrusive methods of treatment extending to electroshock therapy since the emergency detention provisions of M.C.L.A. § 330.-19 expressly exclude such treatment while the former section does not. Logic would further dictate that if electroshock therapy is permitted, chemotherapy would likewise be permitted.

 We find in this implication sufficient basis to declare the pre-hearing detention and temporary commitment provisions of M.C.L.A. § 330.21 violative of the constitutional right to privacy

and due process of law insofar as they permit involuntary treatment of a physically intrusive nature. It must be reemphasized that we deal here with provisions which permit the involuntary treatment of patients belonging to one of two classes, the first comprised of those whose mental illness has never been determined in a hearing of any sort, and the second comprised of those who have been committed by reference to standards which are impermissibly vague and overbroad. We do not deal with involuntary treatment of persons permanently committed.

*VI. Res Judicata.*

 Plaintiffs allege that the Michigan statute is constitutionally defective because it does not expressly prohibit a court confronted with a commitment petition from considering facts alleged in an earlier petition and already found insufficient to require commitment. When in a previous proceeding it has been held that a person's mental condition does not necessitate commitment, we agree that the court considering a second petition may base its decision only upon facts which have arisen subsequent to the first judgment. However, this is a conclusion which inheres in traditional concepts of res judicata, concepts which presumptively apply to civil commitment proceedings as they apply to other judicial processes. Since the Michigan statute contains no provision indicating to the contrary but rather is silent on the subject, we must follow the presumption and construe the statute to include this limitation. Plaintiffs' argument in its entirety relates to practices alleged to have occurred in specific cases. The question whether or not such abuses have occurred in actual practice is not before us as plaintiffs attack the validity of the statute on its face.

---

18. Approved April 16, 1956; effective January 1, 1957.

19. Approved July 3, 1957; effective immediately.

20. Until a recent Michigan state court decision psychosurgery, the most grotesquely intrusive form of treatment, was considered within its purview. Kaimowitz v. State Dept. of Mental Health, 42 L.W. 2063 (July 31, 1973).

"The doctrine of res judicata does apply to adjudications of insanity:

'Where the purpose of an insanity proceeding is to affect the status of the person in question, or, in other words, his legal relation to the rest of the world, whether in respect of his liberty or his personal and property rights, it is obviously in the nature of a proceeding in rem to that extent, and any resulting judgment is undoubtedly binding upon the whole world as to the status thus adjudicated . . . .' 2 Freeman on Judgments (5th ed.), § 902, p. 1898.

"There is no requirement of the Constitution mandating that every statute reenact all provisions of the common law which may be applicable to any proceeding under that statute." P. 18–19, Defendants' Brief.

CONCLUSION

In a pre-trial conference in this cause plaintiffs withdrew their demand for certification of a class. Accordingly, the conclusions stated herein apply to the individual plaintiffs.

The court notes that Annette Bell is now under no restraint and that by reason of a temporary order of one of the members of this court, Gloria A. Dalimonte is likewise now under no restraint. Necessarily the temporary order in the case of plaintiff Dalimonte is made permanent.

In the event further proceedings are instituted against Annette Bell which are contrary to circumscribed protections declared in this opinion, she may by a petition in this action be entitled to a prompt hearing and protection from intrusion upon her constitutional rights.

While we find and declare the Michigan civil commitment statute unconstitutional as set forth herein, we are mindful that currently both the Michigan legislature and the Michigan Supreme Court are pursuing efforts to enact new laws and rules. In view of these efforts and in order to avoid the immensely disruptive effects which broad-scale in-

junctive orders would occasion, we do not enjoin the operation of the statute at this time but retain jurisdiction of these cases pending enactment of amendatory laws and rules in accordance with this opinion.

Appropriate orders consistent with this opinion may be presented.

ORDER FOR PARTIAL SUMMARY JUDGMENT

Before McCREE, Circuit Judge, FOX, Chief District Judge, and FEIKENS, District Judge.

A three-judge district court having been convened pursuant to the provisions of 28 U.S.C. § 2281 and 28 U.S.C. § 2284 to consider the constitutionality of M.C.L.A. § 330.21; M.S.A. § 14.811 and M.C.L.A. § 330.54; M.S.A. § 14.-844, on plaintiffs' complaint and motion for partial summary judgment and defendants' response thereto, and the court, having filed its opinion in these causes, now orders partial summary judgment in favor of plaintiffs as follows: ·

1. In accordance with a stipulation of the parties, plaintiffs' motion for a class action is dismissed.

2. M.C.L.A. § 330.21; M.S.A. § 14.-811 and M.C.L.A. § 330.54; M.S.A. § 14.844 are declared to be facially violative of due process of law insofar as these provisions fail to require the following:

a. That a copy of the petition for civil commitment be served on the person alleged to be mentally ill.

b. That notice of a civil commitment proceeding be served on the person alleged to be mentally ill sufficiently in advance of the hearing to permit adequate preparation.

c. That advice of the right to counsel, the right to appointed counsel in cases of indigency, and advice of all other rights afforded by Michigan statutes be given at the outset of the commitment proceeding.

d. That the person whose commitment is sought be present at the commitment hearing. If it is alleged that it would be improper and unsafe for an allegedly mentally ill person to appear in the committing court, the court must consider alternate methods of conducting the hearing and may only exclude the allegedly mentally ill person where that person's conduct becomes so disruptive that the proceeding cannot continue in any reasonable manner.

e. That involuntary commitment be permitted only upon the demonstrated existence of a mental illness that causes such a person to present an imminent threat of physical harm to himself or to other persons.

f. That when a person believed to be mentally ill and dangerous to himself or others is involuntarily detained prior to any judicial hearing, such detention shall not continue unless a prompt preliminary hearing is held at which hearing it is determined that there is probable cause to believe that the person is mentally ill, is dangerous to himself or others and that continued confinement is necessary. If such probable cause is established, such person may be detained for a reasonable time until a full hearing can be held. At a minimum, the preliminary hearing must be preceded by adequate notice and a copy of the petition which clearly states reasons for seeking his commitment must be served upon him. The confined person must be present at the hearing, subject to the conditions set forth in subparagraph (d) of this order and the confined person must be represented by counsel unless there has been a knowledgeable waiver of the right of counsel, and such person must be given an opportunity to rebut allegations that his confinement is lawfully required.

3. That M.C.L.A. § 330.21; M.S.A. § 14.811 and M.C.L.A. § 330.54; M.S.A. § 14.844 are violative of the constitutional right of due process insofar as they permit, prior to a final adjudication of mental illness, involuntary surgery, shock treatment and chemotherapy. Chemotherapy shall not be administered to an individual until after final adjudication unless the individual consents to such chemotherapy or unless the administration of such chemotherapy is necessary to prevent physical injury to the individual or others. Such treatment shall be given only where acts of the patient or other objective criteria clearly demonstrate to a physician that the patient is presently dangerous to himself or others.

Nothing in this order shall be construed as a finding or a declaration that it is unconstitutional to involuntarily treat a person who has not been finally adjudicated as mentally ill, but who in the professional judgment of a physician appears to be in immediate need of treatment in order to prevent him from physically harming himself or others, provided such treatment is necessary to maintain physical health.

4. This court makes no findings regarding the constitutionality of the emergency detention procedures contained in M.C.L.A. § 330.19; M.S.A. § 14.809.

5. This court declines to enjoin the operation of M.C.L.A. § 330.21; M.S.A. § 14.811 and M.C.L.A. § 330.54; M.S.A. § 14.844 at this time, for the reason that the Michigan Legislature and Michigan Supreme Court are now pursuing efforts to enact new laws and rules and for the reason that an injunction would be immensely disruptive and because there appears to be no current violation of the rights of either plaintiff in any of the respects set forth above.

6. This court retains jurisdiction of these cases pending enactment of amendatory laws and rules and for such further proceedings as may be necessary herein.

Judge McCree concurs in this order in all respects except that he would define *chemotherapy* as it is used in paragraph 3.