**Terry KENDALL, on behalf of herself and others similarly situated, Plaintiff,**

**v.**

**Laurel TRUE, Director, Dept. of Human Resources, Comm. of Kentucky Individually and in his official capacity et al., Defendants.**

**Civ. A. No. C 74–64 L(A).**

United States District Court,
W. D. Kentucky,
Louisville Division.

Feb. 26, 1975.

Curtis B. Stuckey, J. Reuben Rigel, Legal Aid So. of Louisville, Inc., Louisville, Ky., for plaintiff.

Hubert P. Griffin, Frankfort, Ky., for Laurel True.

Victor E. Tackett, Louisville, Ky., for Kendall.

Edwin A. Schroering, pro se.

J. Paul Keith, III, Asst. Commonwealth Atty., William L. Hoge, Louisville, Ky., for Judge Ryan.

Before LIVELY, Circuit Judge, and BRATCHER and ALLEN, District Judges.

## MEMORANDUM OPINION

ALLEN, District Judge.

This action, attacking the constitutionality of two of Kentucky's Mental Health Statutes, K.R.S. 202.060 and 202.100, arises out of the following factual situation.

On February 7, 1974, defendant, Donald L. Kendall, filed a petition for the commitment of his wife, Terry Kendall. The petition states that it was filed pursuant to K.R.S. 202.040 or 202.135, and that Mrs. Kendall is of such a mental or emotional state as not to be able to appropriately control her behavior, and further, that she probably will cause injury to herself or others if not restrained, and that she doesn't have the capacity or insight to authorize her own hospitalization. It further states that Mrs. Kendall could be physically dangerous to the arresting officer, and that she be conveyed to the Louisville General Hospital for observation and treatment and all proper relief.

In order to secure a warrant to obtain Mrs. Kendall's arrest, the petitioner stated that Mrs. Kendall might take her life, that she had been playing games in the park at 3 a.m. while her two year old child was left at home, and that she could not talk to a person because she went into a rage. Other instances of lack of care for her child were also cited.

On the basis of this information, the warrant was issued for Mrs. Kendall's

arrest, although it is stated that an attempt was made to get in touch with her family to verify the information. Subsequently, a complaint was filed in this action on February 8, 1974, and on that same day, the originating judge restrained the defendants from arresting or otherwise detaining the plaintiff under K.R.S. 202 until the constitutionality of the statutes which had been attacked had been determined.

The statutes which are under attack are as follows:

K.R.S. 202.060 "Warrant for arrest of dangerous patient; detained in hospital or facility, when.

"If the petition alleges that the defendant probably will cause injury to himself or others and that he does not have the capacity or insight to authorize his own hospitalization a warrant may be issued for his arrest. Such person if arrested on such warrant shall be conveyed immediately to any hospital, medical facility or institution approved by the commissioner and shall be there examined by one or more staff physicians or psychiatrists of the hospital or facility. If an authorized staff physician concurs that the person probably will cause injury to himself or others if not immediately restrained and thus should be hospitalized, such person may be retained in the hospital pending a hearing and judgment from the appropriate court as prescribed in KRS Chapters 202, 203 or 210, or may be transported to an appropriate state hospital or institution, affiliated with the examining facility, for such retention."

K.R.S. 202.100 "Petition for sixty-day observation, order, procedure.

"When a petition for a sixty-day observation order has been properly filed with the clerk of the court, the court shall appoint two physicians to examine the proposed patient and to certify to the court their findings as to the mental condition of the individual and his need for obser-

vation or treatment. Where the individual named is already a patient in a hospital by virtue of a provision of KRS Chapters 202, 203 or 210, the court may waive the appointment of two examining physicians, and accept as evidence of the patient's mental condition the certification of two authorized staff physicians of the hospital in which the patient is held. If the examining physicians certify to the effect that the individual requires further observation or treatment, the court may order such person to a state mental hospital or other medical facility approved by the commissioner, or if facilities are available and if such person is eligible for care or treatment therein, to the United States veterans administration or other agency of the United States government for a period of care and medical examination, observation and treatment of the mental condition of such person for a period of time not to exceed sixty days."

The proof adduced prior to the three-judge court hearing reveals that the following procedures are followed in the Jefferson Circuit Court with regards to persons who are detained under K.R.S. 202.100.

First, mental inquest hearings are held on the second and fourth Fridays of every month at the River Region Hospital. It is possible that there could be a wait of as much as 29 days between the filing of the petition for a 60 day commitment and the hearing, or as little as 9 days could elapse. It is established that 20 to 47 cases are heard by one judge on one day, and that the average is approximately 30 per day. The mental inquest clerk testified that where an average of 30 cases are heard per day, the court is usually finished by 12 o'clock noon, which would indicate to this Court that roughly, within a three hour period that the 30 cases are disposed of, there is an average of 10 cases per hour.

About three-fourths of the hearings are 60 day hearings, and the patients are

present about 99 percent of the time. However, whether they are present or not is determined solely by the court's psychiatrists. The patients are represented by an appointed counsel and they can usually see their clients prior to the hearing. The record is not clear as to whether one attorney represents the entire case load or whether more than one attorney does. The patient is not informed of his right to a jury trial and no court reporter is present to transcribe the proceedings. It is established also that the judge discusses the cases with the two doctors, who have examined the patient before the patient is brought into the courtroom or chambers, and with counsel for the patient and the Commonwealth's attorney. The testimony does not disclose whether any of the patients are under sedation or tranquilizers at the time of the hearing.

When the mental inquest clerk is presented with the petition by the committing petitioner, he issues the warrant on the basis of the information contained in the petition. The patient is not given any advance notice that he will be arrested, and is not given a probable cause hearing if he is being held under the 60 day statute, as distinguished from those patients who are charged under the involuntary commitment statute which does require an emergency detention hearing.

The attorney for the patient is not given any psychiatric reports prior to the hearing, nor is any other information available to him in the files of the court, other than the petition and the warrant. The judge always either commits the patient for the 60 day observation and treatment or orders his release. No less restrictive alternative to commitment is mentioned or discussed during the proceedings.

The recommendation for mental inquest and commitment is traditionally done by the city-county hospital. The recommendation is usually made by a social worker but is signed by a psychiatrist. After a patient is brought to the hospital, he is examined by two psychia-

trists and also receives a physical examination and a neurological one. He is advised that he has a right to see a lawyer, and he is given a chance to contradict the matters set out in the petition in his interview with the psychiatrist. The examining psychiatrist sees 30 patients in eight hours and the average interview lasts about twenty minutes. Generally, they attempt to see the patient within three or four days, in order to make a qualified recommendation to the court. Their testimony is not required in court until they make a written report to the court setting out their recommendations as to whether the patient is in need of further observation and treatment.

■ Before deciding the merits of the attack on the constitutionality of the two statutes involved, several preliminary matters must be resolved. First is plaintiff's request for a class action, both as to a class of plaintiffs and as to several classes of defendants. We do not believe that a class action determination hearing would be of any material assistance to the resolution of this case, except as to those persons who may be affected by proceedings in the Jefferson Circuit Court. As to these persons, we conclude that, pursuant to Rule 23(b)(2), Federal Rules of Civil Procedure, plaintiff meets all of the qualifications and is entitled to represent a class designated as any and all persons who, in the future, would be subject to arrest pursuant to K.R.S. 202.060 and/or to commitment pursuant to K.R.S. 202.100 in Jefferson County, Kentucky.

■ With reference to the various Commonwealth's attorneys, it is alleged that Mr. Schroering, the Commonwealth's Attorney for Jefferson County, should serve as a class representative for the 120 Commonwealth's attorneys. In light of the particular attack on the procedures in Jefferson County, and that any determination as to the constitutionality of the statutes will affect all Commonwealth's attorneys equally, the Court sees no reason to grant class action certification as to Mr. Schroering.

Finally, a determination is sought that Judge George Ryan, Judge of the Jefferson Circuit Court, Common Pleas Branch, Fourth Division, be designated as a class action representative of all circuit court judges of the Commonwealth of Kentucky. The record is devoid of any evidence as to how many circuit judges in counties other than Jefferson conduct their procedures under K.R.S. 202.100, but the record does reflect that Judge Ryan and the six other judges of the Common Pleas Branch of Jefferson Circuit Court conduct all the mental inquest hearings for Jefferson County. This has been a long standing tradition in the Jefferson Circuit Court which is composed of sixteen judges, and we believe that Judge Ryan may properly be designated as representative of these sixteen judges who conduct their collective activities under the name of the General Term of Jefferson Circuit Court.

We come next to the claim of plaintiff for damages against Judge Ryan. There is no merit in this claim since Judge Ryan is cloaked with judicial immunity, and was acting pursuant to procedures established by the Jefferson Circuit Court, and in accordance with the procedures set out in K.R.S. 202.100. The claim for damages against Judge Ryan is hereby dismissed. See Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

It should be observed that Donald L. Kendall has not filed an answer to the complaint. The originating district judge should, therefore, enter judgment against him and pursue such other proceedings as are necessary to complete that phase of the case.

Coming now to the merits, we had occasion to read the very balanced and excellent article in Vol. 87 Harvard Law Review, commencing at p. 1190 entitled "Developments—Civil Commitment". That article takes the position which we believe to be sound, that the state may, ·under appropriate circumstances, involuntarily commit a person who is suffering from a mental illness. The first of these circumstances is where the person is a danger to society; the second is where he is dangerous to himself. These commitments are allowable under such statutes as K.R.S. 202.135 and are based upon the police power of the state for the protection of its citizens.

The Kentucky statutes which are under attack here were apparently drafted pursuant to the theory that where an individual is mentally ill and lacks the capacity to make a choice or has become so confused that he cannot make a decision having any relation to the factors bearing on his hospitalization, he may then be civilly committed under the *parens patriae* doctrine. See the discussion in the Harvard Law Review article at pp. 1216 and 1217, which supports this theory.

However, this theory and the *parens patriae* doctrine which has been used to uphold such commitment statutes has fallen into disfavor with the courts. In State ex rel. Hawks v. Lazaro, 202 S.E.2d 109 (W.Va.1974), the West Virginia statute provided for involuntary hospitalization if the individual was "in need of custody, care or treatment in a hospital and, because of his illness or retardation lacks sufficient insight or capacity to make responsible decisions with respect to his hospitalization. . . ."

The court stated, in holding this statute unconstitutional, that the state was unable to demonstrate any compelling state interest under the police power for hospitalizing a person in his own best interest. It is pointed out that society abounds with persons who should be hospitalized for physical causes and yet society would not contemplate involuntary hospitalization for treatment. The court further held that:

"[t]he standard of hospitalization for the benefit of an individual leaves an entirely subjective determination for the committing authority which violates due process because it forecloses a meaningful appeal and places the individual in jeopardy of losing his freedom without providing an objective standard against which the com-

mitting authority's determination can be measured."

The court points out as to the *parens patriae* doctrine that it is possible for many non-violent persons who suffer from a mental disease or retardation to live outside of an institution, and when they prefer to do so, regardless of the wisdom of their decision or the strength of their reasoning powers, they have their constitutional rights to follow their own desires.

A recent decision of the United States District Court for the Western District of Michigan in Bell v. Wayne County General Hospital, 384 F.Supp. 1085 (1974), a three-judge court composed of Circuit Judge Wade H. McCree, Jr., Chief District Judge Noel P. Fox and District Judge John Feikens, states that it was agreed between the parties that dangerousness to self or to others was the only criterion by which a person who suffers from a mental illness may be involuntarily committed in a civil action. State ex rel. Hawks v. Lazaro, supra, upholds a West Virginia statute based on dangerousness to self or others, and distinguishes it from the type of statute which the Harvard Law Review article states is appropriate under the *parens patriae* doctrine.

In Lessard v. Schmidt, 349 F.Supp. 1078 (E.D.Wisc.1972), vacated and remanded on other grounds, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), the three-judge court went to great lengths to read into the statute a requirement of a finding of dangerousness to self or to others. See the discussion 349 F. Supp. on p. 1093.

We do not believe that we can read into K.R.S. 202.100 such a requirement, in view of the fact that these requirements are found in K.R.S. 202.135 and in the alternative provisions of K.R.S. 202.060. This indicates that the legislature knew when to require dangerousness as a prerequisite to commitment, and that this was, in fact, done in statutes other than those under attack.

The three-judge court from the Middle District of Alabama in Lynch, et al. v. Baxley, 386 F.Supp. 378 (decided December 14, 1974) specifically holds that there must be a finding of dangerousness to self or others before an involuntary civil commitment may be made of a mentally ill person.

We point out that even if the holdings in *Hawks, Bell, Lessard* and *Lynch,* supra, are erroneous with regards to the requirement of dangerousness, K.R.S. 202.100 is still fatally vague. In Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), the court struck down an ordinance for vagueness because it failed to give a person of ordinary intelligence fair notice that his contemplated conduct was forbidden by the statute, and because it encouraged arbitrary and erratic arrests and convictions. K.R.S. 202.100, likewise, fails to meet constitutional requirements of precision, which must be met where curtailment of personal liberty is involved. The statute merely requires a certification by two physicians as to the mental condition of an individual and his need for observation and treatment, and subsequently, a certification that he requires further observation and treatment.

With regards to a similar Michigan statute, M.C.L.A. 330.21, Chief Judge Fox points out in Bell v. Wayne County General Hospital, supra, that nowhere does the statute state why the detention is necessary or essential, and that the statute sets forth the process under which a person, whose affliction, in the view of a given court, falls anywhere within a vast, uncontoured description of mental ills, is subject to both temporary and indefinite commitment, whether his particular ill presents a realistic threat of harm to himself or others. Chief Judge Fox concluded that portion of the opinion by stating that the standard of commitment for mental illness was fatally vague and overbroad.

We conclude that K.R.S. 202.100 suffers from a failure to specify precise standards by which the physicians or

the courts should be governed in determining whether or not to commit an individual civilly for 60 days. The only basic requirement in the statute is that a finding be made that an individual needs care and treatment, and nothing in the statute requires findings as to why and under what conditions care and treatment may be imposed on an individual.

■ In addition to the above-mentioned constitutional defects, K.R.S. 202.100 is woefully deficient in its due process aspects. The minimum requirements of due process, as we interpret *Bell, Lessard, Lynch* and *Hawks,* supra, are the following:

1. A right to a preliminary probable cause hearing, although this need not be overly formal and may properly include the receiving of doctors' reports as hearsay.

2. The right to a notice before the final hearing, setting out in some detail the factual reasons upon which the state intends to rely in seeking the 60 day commitment.

3. The requirement that the final hearing be held within 21 days of the date of confinement. It is noted that the statute has no time limit in this respect.

4. The right of the patient to be present at both hearings, unless the right is intelligently waived by himself and counsel, or unless the Court makes a specific finding after the patient has been brought to the place of hearing that he should be removed from the hearing because his conduct is so disruptive that the proceeding cannot continue in any reasonable manner. See Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) and Bell v. Wayne County General Hospital, supra, 384 F.Supp. at p. 1094.

We note that to comply with the mandate of due process, the case of In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1967) holds that in a juvenile delinquency proceeding where the juvenile faces the prospect of incarceration, notice to the child and his parents must inform them of the specific allegations to be raised at the hearing, and must be given at the earliest practical time, in any event, sufficiently in advance of the hearing to permit preparation. 387 U.S. at p. 33, 87 S.Ct. 1428, and Bell v. Wayne County General Hospital, supra, 384 F.Supp. at p. 1093.

We recognize that the judges of the Jefferson Circuit Court are desirous of complying with due process standards if this would result in the preservation of K.R.S. 202.100. We recognize also that the members of that court did not concede in any way that either K.R.S. 202.-060 or 202.100 is unconstitutional. However, in the light of the patent unconstitutionality of 202.100, it appears obvious that nothing which the circuit judges could attempt to resolve by their actions and procedures could make constitutional K.R.S. 202.100.

We realize that the legislature of Kentucky does not meet again until January, 1976. However, we point out that our holding here does not do away with the state's right to commit persons who are dangerous, either to themselves or to society, and we repeat that these are the only grounds upon which commitment can be made in civil cases of the mentally ill.

In reaching our views, we have not ignored contrary opinions found in Logan v. Arafeh, 346 F.Supp. 1265 (D. Conn.1972), aff'd 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 and Fhagen v. Miller, 29 N.Y.2d 348, 328 N.Y.S.2d 393, 396, 278 N.E.2d 615, 617 (1972), cert. denied 409 U.S. 845, 93 S.Ct. 47, 34 L.Ed. 2d 85. *Fhagen* holds that the commitment of non-dangerous mentally ill persons under civil procedures, where no criminal proceeding is involved, does not violate due process.

We respectfully disagree with the conclusion reached in Logan v. Arafeh, supra, to the effect that a state may constitutionally hold a person subject to a civil commitment for 45 days without granting him or her a full due process

hearing, if desired. We recognize, also, that Kentucky's statute is for a relatively short period of time and has a definite maximum time of confinement, ·but these features cannot save it from its many deficiencies which we have previously noted.

Finally, we observe that we have not gone into great detail in discussing the history of mental health laws, civil commitments, the consequences of civil commitment, and the requirements of due process relative thereto, since we believe that the decision in Lessard v. Schmidt, supra, very ably sets out all of these considerations.

■ With regards to K.R.S. 202.060, the Court is of the opinion that the statute is sufficient to meet the attack on constitutional grounds. It contains the constitutional requirement of probable causation of injury to self or others, and it adds to that requirement the necessity to allege lack of capacity or insight to authorize hospitalization. The individual, thus, has a dual protection from illegal arrest under this statute, and although the statute comprises two theories as its basis, that is, the police power of the state and the *parens patriae* ⸱doctrine of incapacity, we believe that at worst the incapacity provision is superfluous.

Finally, we must enter an injunction restraining the judges of the Jefferson Circuit Court from conducting any proceedings regarding the 60 day commitment of the mentally ill, pursuant to K.R.S. 202.100.

■ With respect to those persons who are now being held under observation and treatment in Jefferson County, we observe that they have a right to pursue the remedy of habeas corpus if they should believe that it would be to their best interest to be released. We note in this connection that it would seem appropriate for the Jefferson Circuit Court to ask counsel for such persons to discuss the matter with their clients and with the medical authorities if need be

before making a judgment as to whether habeas corpus proceedings would be appropriate.

A judgment in accordance with this opinion has been filed this day.