PEOPLE *ex rel* BOOK v HOOKER

Docket No. 77-2533. Submitted April 6, 1978, at Lansing.—Decided
    May 22, 1978. Leave to appeal applied for.

Steven Hooker was adjudged a person requiring treatment and
    involuntarily committed to a mental health facility for 60 days.
    At the end of the initial commitment the mental health author-
    ity petitioned the Genesee Probate Court for a 90-day recom-
    mitment order, alleging that the defendant, although somewhat
    improved, was a person who continued to require treatment.
    The petition was dismissed on grounds that the patient did not
    meet the criteria for involuntary commitment. The petitioners
    appealed to Genesee Circuit Court and the probate order was
    reversed and the petition for recommitment granted, Philip C.
    Elliott, J. Steven Hooker appeals by leave granted contending
    that the mental health authorities must meet the same stan-
    dards for a recommitment order that they must meet for an
    original order of commitment and that standard was not met at
    the time of his recommitment. *Held:*

    A petitioner seeking a 90-day recommitment order under the
    Mental Health Code following a 60-day initial commitment
    must show that the patient to be involuntarily recommitted is
    a "person requiring treatment" under the act, which is the
    same standard applied in granting the original commitment
    order. There was enough evidence in the present action, how-
    ever, for the probate court to have found that the patient did
    meet that standard at the recommitment hearing.

    Affirmed.

1. MENTAL HEALTH—STATUTES—RECOMMITMENT ORDERS—STANDARDS
    —INTENT OF LEGISLATURE.

    A petitioner seeking a 90-day recommitment order under the
    Michigan Mental Health Code following an initial 60-day com-
    mitment must show that the patient to be involuntarily recom-
    mitted is a "person requiring treatment" under the code, which
    is the same standard applied in granting the original 60-day
    order; to allow a lesser standard for recommitment would be

REFERENCE FOR POINTS IN HEADNOTES
[1, 2] 41 Am Jur 2d, Incompetent Persons § 33 *et seq.*

unconstitutional and contrary to the intent of the Legislature to provide objective criteria for involuntary civil commitments and to make the process fundamentally judicial rather than medical (MCL 330.1401, 330.1472, 330.1476[2]; MSA 14.800[401], 14.800[472], 14.800[476] [2]).

2. MENTAL HEALTH—PERSONS REQUIRING TREATMENT—INVOLUNTARY COMMITMENTS—RECOMMITMENTS—POSSIBILITY OF RECURRENCE.

A person who is dangerous to himself or others is a person requiring treatment under the section of the Mental Health Code governing involuntary commitments; a patient who has been committed under this section and who has responded to treatment may still be found to be a person requiring treatment at a hearing on a 90-day recommitment order where there is competent medical testimony that there is an imminent possibility of recurrence of the symptoms which gave rise to the original commitment order (MCL 330.1401; MSA 14.800[401]).

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Robert F. Leonard,* Prosecuting Attorney, for the people.

*Richard M. Barron,* for defendant on appeal.

Before: ALLEN, P. J., and V. J. BRENNAN and M. F. CAVANAGH, JJ.

ALLEN, P. J. In order to justify a 90-day recommitment order under § 472(2) of the Michigan Mental Health Code MCL 330.1472; MSA 14.800(472), must the petitioner show that the patient is a "person requiring treatment" (hereinafter PRT) as defined in § 401 of the code, *i.e.,* mentally ill and dangerous to himself or others? Or is a lower standard under which the people are required to prove only that the patient "continues to require treatment" sufficient? The probate court held that the higher standard was mandated by statute but, on appeal, the circuit court held the lower standard was sufficient.

Steven Hooker was involuntarily, civilly committed to Ypsilanti State Hospital on March 23, 1977, for 60 days as a PRT. He was found to be suffering from chronic schizophrenia, undifferentiated, and was placed on medication. The propriety of the original commitment is not challenged. As the end of the 60-day commitment approached, the hospital authorities concluded that the patient required further treatment prior to being released. Accordingly, a petition was filed in the Genesee County Probate Court under § 472(2), to continue the involuntary commitment for an additional 90 days. At the hearing held before the probate judge on the petition, a psychiatrist for the people testified that the patient could "get up and take care of himself, like put his clothes on and he can eat, but about medication I don't know if he has enough judgment to take medication weekly". The psychiatrist concluded that the patient's prognosis was fair with continued hospitalization, but was poor if the patient did not receive treatment. At the conclusion of the psychiatrist's testimony, the probate judge dismissed the petition because plaintiff had failed to prove that the patient was dangerous either to himself or to others, and an order was entered dismissing the matter because the patient had not "met the criteria for involuntary commitment".

As a result of that order, the patient was released on May 19, 1977, and plaintiff filed a claim of appeal with the Genesee County Circuit Court. Following arguments, the circuit court ruled on June 20, 1977, that the probate court had applied an incorrect legal standard. According to the circuit judge, the statute did not require proof that the patient was a PRT but only required proof

that the patient "continues to require treatment".[1] Noting the ambiguity of the statutory language, the circuit judge advised counsel to appeal to this Court, but remanded the case to the probate court for a hearing under the "continues to require treatment" standard. The hearing upon remand was held June 22, at the conclusion of which the probate judge ruled:

"I might be mistaken, I still don't believe that the evidence meets the statutory criteria, however, that's sort of academic at this point because the Circuit Court has found that is the standard to be applied. That you do not have to show that the person is mentally ill neither dangerous, to himself or to others, however, cannot perform the necessary functions in order to sustain himself. Now than [sic] you simply have to show that this person is still mentally ill. Now, applying that standard then I find based on the Doctor's testimony that he still requires treatment, that Mr. Hooker is mentally ill and does require treatment and I am therefore going to order that he be committed to Ypsilanti State Hospital for a Ninety Day treatment."

In the interval between the patient's release from the Ypsilanti State Hospital and the hearing

---

[1] "It is somewhat unfortunate that the Legislature used that term ['continues to be a person requiring treatment'] because it is possible to construe the phrase as Judge Quinn so did construe the phrase. Continue to require treatment to mean that he is a person who continued to be a 'person requiring treatment' within the meaning of the statute. It seems to me that that was not the intent of the Legislature, and that, as Mr. Burden indicated, what the Legislature intended was after a person has been determined to be, for one reason or another, a person requiring treatment within the meaning of that statutory definition.

\* \* \*

"I would hope, however, that in this case or some other case an opinion of the Court of Appeals could be obtained. They can decide once and for all the meaning of that phrase, 'continue to require treatment', and should decide it so that the Probate Court of Genesee County and the other counties are informed by the appellate courts what that phrase means." (Tr, pp 31, 32, 33, 34.)

before the circuit judge, the worst fears of the psychiatrist became a reality. Not long after release, Hooker "kind of went to pieces". He was found at the Community Mental Health building staring blankly at the walls, claiming he was on another planet, refusing to eat and generally in a state of total confusion. These additional facts were brought to the attention of the court at both the circuit court hearing and the probate court hearing upon remand.[2]

The relevant sections of the Michigan Mental Health Code are found in §§ 401, 472 and 476 which read:

"§ 401. As used in this chapter, 'person requiring treatment' means (a), (b), or (c):

"(a) A person who is mentally ill, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself or another person, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

"(b) A person who is mentally ill, and who as a result of that mental illness is unable to attend to those of his basic physical needs such as food, clothing, or shelter that must be attended to in order for him to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.

"(c) A person who is mentally ill, whose judgment is so impaired that he is unable to understand his need for treatment and whose continued behavior as the result of this mental illness can reasonably be expected, on the basis of competent medical opinion, to result in

---

[2] A new petition for involuntary confinement was filed June 9, but hearing was postponed pending hearing by the circuit court on the appeal of the original petition. The new petition was dropped following the 90-day commitment order issued June 22 by the probate court. The 90-day commitment order is the subject matter of the appeal by defendant to this Court.

significant physical harm to himself or others. This person shall be hospitalized only under the provisions of sections 434 through 438 of this act." MCL 330.1401; MSA 14.800(401).

"§ 472. (1) An initial order of hospitalization shall be for a period not to exceed 60 days.

"(2) If, prior to the expiration of a 60-day order, the director believes that the condition of a patient is such that he continues to require treatment, the director shall, not less than 14 days prior to the expiration of the order, petition the court for a *determination that the patient continues to require treatment* and for an order authorizing hospitalization for a period not to exceed 90 days.

"(3) If, prior to the expiration of a 90-day order, the director believes that the condition of the patient is such that he continues to require treatment, the director shall, not less than 14 days prior to the expiration of the order, petition the court for a *determination that the patient continues to be a person requiring treatment* and for an order of continuing hospitalization. An order of continuing hospitalization may be for an unspecified period of time." MCL 330.1472; MSA 14.800(472). (Emphasis supplied.)

"§ 476. (2) The director shall discharge a patient hospitalized by court order when the patient's mental condition is such that he no longer meets the criteria of a person requiring treatment." MCL 330.1476(2); MSA 14.800(476)(2).

The issue posed is of first impression and of considerable importance to the practice in probate courts. Persuasive arguments support the interpretation given the statute by both the probate court and the circuit court. It is logical to assume that since there will normally be some improvement in the patient's condition during the 60-day commitment, the Legislature intended a lesser standard for a 90-day recommitment order. It is also logical to conclude that since § 472(2) requires that "the patient continues to require treatment", whereas

§ 472(3) requires "that the patient continues to be a person requiring treatment", the difference in terminology in successive sections of the statute justifies the conclusion that different standards are to be employed. On the other hand it is equally arguable that although § 472(2) does not use the exact terminology, reading the statute as a whole indicates that the section refers to a PRT. Furthermore, if § 472(2) establishes a different test than that of PRT, that test is nowhere defined in the statute, and continuing commitment could therefore be based on the general opinion of a psychiatrist. Such a construction would be contrary to the purpose of the Legislature which, in enacting the statute, intended to provide objective criteria for involuntary civil commitments and make the process fundamentally judicial rather than medical.

Although the question is admittedly close, we opine that the PRT standard is the proper standard to be applied in 90-day commitment hearings processed under § 472(2). Two considerations—(1) internal consistency with other sections of the statute, and (2) legislative intent to abolish a test based upon the subjective opinion of a psychiatrist —lead to our conclusion. Section 473 requires that the petition for 90-day continuing hospitalization authorized in § 472(2) contain a statement "setting forth the reasons for the director's determination that *the patient continues to be a person requiring treatment*". Obviously, there would be no need to recite PRT reasons if a lower or different standard were intended in § 472(2).[3] Furthermore, § 476 governing discharges requires that the PRT standards

---

[3] The people argue that § 473 is merely a requirement of the petition, not the test to be applied by the court. We reject this argument since there would be no purpose of the petition setting forth the PRT standard if a lower or different standard could be employed by the court.

be applied to involuntarily hospitalized patients.[4] This would include patients involuntarily hospitalized under § 472(1) 60-day hospitalization orders. Obviously, it is totally inconsistent to continue commitment of a patient who does not meet the PRT standard when § 476 provides that the patient *shall* be discharged if he no longer meets the PRT standard.

The new Michigan Mental Health Code, being 1974 PA 258, governing civil admission and discharge procedures for mental illness was enacted in response to *Bell v Wayne County General Hospital,* 384 F Supp 1085 (ED Mich, 1974). In that decision the Court struck down as overbroad and vague the then existing statutory standards for permanent and temporary mental illness.[5] In our opinion the interpretation of the statute as made by the circuit court and as urged by the people in this case would reintroduce into the statute the flaws found fatally defective in *Bell,* for it would impose a different test than that of PRT, a test which is nowhere defined by statute, and a test which would permit continuing commitment based on the general opinion of a psychiatrist. Because we believe this was the evil which the Legislature sought to avoid in enacting 1974 PA 258, we conclude that the words "continues to require

[4] "(2) The director *shall* discharge a patient hospitalized by court order when the patient's mental condition is such that he no longer meets the criteria of a person requiring treatment." MCL 330.1476(2); MSA 14.800(476)(2). (Emphasis supplied.)

[5] "Thus, we must conclude that in MCLA § 330.21 and § 330.54, the Michigan act sets forth a process under which a person whose affliction, in the view of a given court, falls anywhere within a vast, uncontoured description of mental ills, is subject to both temporary and indefinite commitment, whether his particular ill presents a realistic threat of harm to himself or to others. In our opinion, the standard of commitment for mental illness is fatally vague and overbroad." *Bell v Wayne County General Hospital,* 384 F Supp 1085, 1096 (ED Mich, 1974).

treatment" in § 472(2), while maladroit, are a cross-reference to "a person requiring treatment" as employed in § 401, § 473 and § 476 of the code.

Although we conclude that the probate court correctly interpreted the law at the first probate hearing, we also conclude that the court erred as to the facts at the hearing on remand. At the original probate hearing held May 19, 1977, the psychiatrist testified that the patient could then attend to his basic physical needs and, *in his present state of remission,* was not a danger to himself. This obviously made it difficult for the probate judge to find that Hooker met the "dangerous to himself or others" standard. But at the second probate hearing held on June 22, the full facts concerning the patient's disorientation within a few days after being released and his refusal to take food were stated on the record, and no objection was taken thereto. Clearly, the evidence given at the second hearing supported a conclusion that Hooker was a PRT and met the criteria contained in § 472(2) for 90-day continuing hospitalization. Nevertheless, though the probate court erred in holding that the evidence did not meet the statutory criteria, the error was harmless. For the reasons stated in this opinion, the court. reached the right result when, on June 22, 1977, it ordered the patient committed to the Ypsilanti State Hospital for 90-day treatment.

Plaintiff fears that under the statutory interpretation which we have herein adopted, many patients involuntarily committed may be released at the end of the 60-day commitment period just when the treatment program begins to show results. We do not agree. It appears to us that if there is an imminent possibility of recurrence of symptoms, and if there is competent medical testi-

mony to that effect, the patient still would be a PRT under § 401(a), (b), or (c). At the first probate hearing the psychiatrist testified that the patient would not take his medication without supervision and that the patient's mother was not available to provide that supervision. In our opinion, even the evidence given at that initial hearing, though not given as clearly as could be,[6] supported the conclusion that Hooker was a PRT as defined in § 401(c). At the second probate hearing, the testimony left no doubt as to Hooker's PRT status.

Affirmed; no costs, a public question being involved.

---

[6] The problem at the initial hearing was that the medical expert was only asked if at the present time the patient was dangerous to himself, and was not asked whether, if released, he would be a danger to himself or to others. But the testimony at the first hearing, taken as a whole, reveals that the patient continued to be a PRT. This omission can be corrected in future cases.