*In re* JAMES KNESS, Alleged to be a Person in Need of Involuntary Psychotropic Medication (The People of the State of Illinois, Petitioner-Appellee, v. James Kness, Respondent-Appellant).

Second District   No. 2—95—0594

Opinion filed January 18, 1996.

Teresa L. Berge, of Guardianship & Advocacy Commission, of Rockford, and William E. Coffin, of Guardianship & Advocacy Commission, of Chicago, for appellant.

David R. Akemann, State's Attorney, of St. Charles (William L. Browers and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RATHJE delivered the opinion of the court:

Respondent, James Kness, appeals from an order of the circuit court of Kane County approving the involuntary administration of psychotropic medication to the respondent. Respondent raises the following issues on appeal: (1) whether the State proved by clear and convincing evidence that the respondent lacked the capacity to make a reasoned decision about the medication and that the benefits of the medication outweigh potential harm; (2) whether the trial court erred in failing to consider the substituted judgment standard; (3) whether the trial court's order is void for lack of subject matter jurisdiction; and (4) whether respondent was denied the effective assistance of counsel.

During the pendency of this appeal, the respondent filed a motion to strike certain portions of the State's brief. We ordered the motion taken with the case and will discuss its merits upon our disposition of the issues raised.

On April 21, 1995, a hearing was held on two petitions involving respondent, namely, a petition for respondent's involuntary admission and a petition for involuntary administration of medication. The hearing had originally been scheduled for April 5, 1995, but was continued at the request of the respondent. Prior to the commencement of the hearing, the public defender assigned to represent the respondent informed the court that the respondent did not wish her to represent him. The respondent advised the trial court that he did not feel he had received an adequate explanation of the proceedings and that he wished to obtain his own attorney; however, he had not taken

any steps to hire an attorney. According to the respondent, although he had spoken to the public defender, both two weeks before and just prior to the instant proceedings, he was not aware that he could have witnesses brought in to testify on his behalf. The public defender explained to the trial court that it was difficult to explain the procedures to the respondent and that she was unsure as to whether she had informed him that he could have witnesses testify on his behalf. However, she indicated that she was prepared to proceed with the hearing at that time.

Having ascertained that the State opposed a continuance to allow the respondent to obtain another attorney and based upon its questioning of the respondent, the trial court denied respondent's request for a continuance, stating as follows:

> "The Public Defender's Office has been appointed pursuant to an administrative order to represent you. This attorney is the one that would be assigned to this courtroom and she is the one that would represent you. I believe that she has had an opportunity to appear and I believe that she has explained everything to you to the best of her ability.
>
> You may not understand what your rights are, but I believe in her representation that she explained that to you adequately. For that reason we will proceed."

At that time, the assistant public defender made a motion for a continuance based on the respondent's desire to call witnesses on his behalf. The trial court inquired of respondent whom he would wish to call to testify on his behalf, to which respondent replied that he would have to think about it and would need to contact and ask these individuals to testify. The trial court concluded that the respondent did not have any witnesses and that the request for the continuance was a delaying tactic. The trial court then denied the motion for continuance.

Ms. Eve Dwyer, respondent's mother, testified that respondent had resided with her for a period of five years up to March 28, 1995. On that date, she returned home from work to find the respondent extremely agitated and angry over the loss of his job as a truck driver. He accused her of being part of the system that caused him to lose his job. Ms. Dwyer went upstairs to her bedroom, followed by the respondent. He stood in the doorway of her bedroom, shaking his finger in her face. Ms. Dwyer was afraid because respondent was angry and loud and appeared out of control. When she informed the respondent that she wished to leave her bedroom, he placed his hands on her shoulders and pushed her saying that she was not leaving until he was finished talking to her. Respondent continued to repeat that she was part of the system that had caused him to lose his job.

Ms. Dwyer testified further that in January 1995 respondent told her that he was having trouble sleeping because he felt as if someone were probing his brain. In August 1994, respondent told her that he could not drive a truck anymore because certain vehicles he would pass on the road emitted rays. The rays gave him headaches which scared him, and as a result, he could not drive. This caused him to lose his job. In March 1995, while respondent was not working, he would watch television. While he was watching television, he would talk back to the television or talk out loud even though he was alone. Also, in March 1995, he took apart an electrical outlet because he wanted to see from where the "rays and things" were coming.

On cross-examination, Ms. Dwyer admitted that she laughed out loud while watching television but never yelled back at the television. During the August 1994 incident and the January 1995 incident, respondent never harmed her or threatened to harm himself.

On redirect examination, Ms. Dwyer testified that on December 9, 1994, she took the respondent to their family doctor, hoping the doctor could persuade the respondent to take some antidepressant and antipsychotic medication that had been prescribed for him. In response to the doctor's questions, respondent denied that he was going to kill himself or had any plans to do so. On the way home, respondent told Ms. Dwyer that he heard voices that told him that suicide would not be a bad idea. On re-cross-examination, Ms. Dwyer stated that respondent did not attempt to harm her or himself on that date.

Herbert Rohr, a psychiatrist at the Elgin Mental Health Center (Center), testified that he examined the respondent upon his admission to the Center. Since that examination, he spoke with the respondent and observed him around the unit. He also spoke to respondent's family and other staff about respondent. Based upon his examination and the information he obtained, Dr. Rohr diagnosed respondent as suffering from schizo-affective disorder, depressive type, which is considered a serious mental illness. Dr. Rohr described the characteristics of the disorder as consisting of "delusions or hallucinations or deteriorations of function as nature, things that persist when the present or manic episodes are not present. The depressive part would be suicidal thoughts, lack of care for himself, difficulty with sleeping and with eating." Respondent had suffered this condition for at least one year.

Dr. Rohr testified further that respondent displayed specific symptoms, such as delusions. Respondent did admit to Dr. Rohr that he believed someone was "taping things" at home and that he had been unable to work for a year due to a fever but refused to discuss any other delusions with the doctor. Most of the information regard-

ing respondent's delusions came from respondent's mother. Through respondent's mother, Dr. Rohr was made aware of respondent's talking to the television, rays from other vehicles, hearing voices, and thoughts of suicide, as well as the fact that respondent had been seen by a psychiatrist for treatment for depression, as well as psychosis. Also, according to his mother, respondent was not bathing or caring for himself because he believed that the shampoo was poisoned.

Dr. Rohr opined that respondent was mentally ill and could reasonably be expected to inflict serious physical harm on himself or someone else in the near future. The delusions that respondent had were likely to cause him to act out against whoever he felt was responsible for his problems. His depression and apparent inability to function outside of a controlled environment, such as the Center, created a significant threat that he might harm himself. Dr. Rohr further opined that, because of his mental illness, respondent was unable to provide for his personal needs and to guard himself from serious harm, given that he had not been able to work for an extended period of time.

Dr. Rohr further testified that, although respondent had been eating and sleeping, he required prompting to take care of his basic hygiene. The Center was the least restrictive environment; due to his lack of cooperation, generally, not taking his medication, a halfway house would not accept him. Dr. Rohr recommended that respondent be placed on antipsychotic medication to offset his delusions.

Dr. Rohr further testified that, while in the Center, respondent had not been disruptive. He was aware of the March 28, 1995, altercation in which respondent's mother had to call the police. Respondent was taken to the hospital and placed in restraints.

Dr. Rohr recommended that respondent receive antipsychotic medication, in the safest and lowest amount, which would eliminate or dampen the delusions he suffered from so he could resume a normal life. When questioned about possible side effects, Dr. Rohr stated that respondent would be monitored for side effects and that there were medications that could be administered to relieve such side effects. In Dr. Rohr's opinion, the administration of such medication outweighed any possible harm to respondent. Dr. Rohr further opined that respondent lacked the capacity to make a reasonable decision about the medication due to his unawareness of his illness or inability to function.

On cross-examination, Dr. Rohr acknowledged that, while respondent's chart showed his continued refusal to take medication, he was otherwise cooperative and not disruptive. Dr. Rohr further acknowledged that, in his discussions with respondent, he never

expressed any suicidal thoughts or threats to harm other people. Dr. Rohr recalled one incident of aggressive behavior which occurred on April 6, 1995. The note on respondent's chart stated, "his boots are on the drapes and walls. Dares anyone suggest that he stop." Dr. Rohr characterized the notation as an indication of a threat of serious harm either against respondent himself or staff.

Following argument from both parties, the trial court granted the petition for involuntary commitment. With respect to the petition for involuntary administration of medication, the trial court also granted that petition, stating as follows:

"With respect to the petition for medication, I find there is clear and convincing evidence, as was mentioned earlier, that this mental illness is causing a deterioration of your ability to function; that this deterioration is a continuing problem; that the benefits of the medication outweighs [sic] the side effects or any harm; that at the present time you lack the capacity to make a decision concerning medication; that less restrictive services have been explored and have been found to be inappropriate. Therefore, the period for the medication shall not exceed 90 days."

Following an extended recess, the case was recalled at the request of the respondent. The assistant public defender moved to reopen the proofs to allow the respondent to testify in his own behalf, although she had advised him not to do so. The trial court allowed the motion and permitted the respondent to testify in a narrative fashion.

Respondent testified that he had been on medication since his arrival at the Center and that Dr. Rohr had told him that his behavior was "just fine." Therefore, respondent did not think the petition for medication was proper or that he required medication.

Respondent further testified that he took apart the electrical outlet because it was unusual. He did not put it back, and his family was upset about that. He did not hear audible sounds from other vehicles, and what he did hear he did not believe was directed at him. He admitted watching a lot of television but found nothing wrong with that. He denied pushing his mother or touching her at all. He did point at her and felt there were things she was lying about, but he did not threaten her. He did not resist the police when they arrived. He also denied challenging anyone in the "drapes" incident.

On cross-examination, respondent testified that other vehicles were not emitting any rays.

On redirect examination, respondent testified in response to the assistant public defender's questions that Dr. Rohr reviewed a list of symptoms with him which respondent denied having. He further

denied making the statements Dr. Rohr had on a list. He denied trying to commit suicide since he had been at the Center. He further denied telling his mother that he wanted to commit suicide. At his initial interview with Dr. Rohr, he did not volunteer information because he felt that Dr. Rohr had already made up his mind. He admitted that he sometimes laughs out loud while watching television.

Under questioning by the trial court, respondent testified that he took apart the electrical outlet because its unusual design interested him. He denied that he had any difficulty with other vehicles while driving his truck. He became unemployed when, due to a bad cold and headache, he was home for two weeks. Upon his return to work, he was told he was fired. He never told anyone he felt the television was watching him or that people were watching him. He believed that his mother was lying when she testified that he pushed her on the shoulder. However, he did not believe that his mother or his boss was out to get him. He described the voices that he heard as his own voice.

After hearing further argument, the trial court determined that there was a conflict in the testimony, and it found the testimony of the respondent's mother and Dr. Rohr more credible than that of the respondent. The trial court then denied the motion to reconsider and reaffirmed its original order.

We note at the outset that the issue of the petition for involuntary admission is the subject of another appeal.

Section 2—107.1 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1—100 *et seq.* (West 1994)) sets forth procedures for the involuntary administration of psychotropic medication. Section 2—107.1(d) provides in pertinent part as follows:

> "(d) Psychotropic medication shall not be administered to the recipient unless it has been determined by clear and convincing evidence that all of the following factors are present:
>
> (1) That the recipient has a serious mental illness or developmental disability.
>
> (2) That because of said mental illness or developmental disability, the recipient exhibits deterioration of his ability to function, suffering, or threatening or disruptive behavior.
>
> (3) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in paragraph (2) of subsection (d) of this Section or the repeated episodic occurrence of these symptoms.
>
> (4) That the benefits of the psychotropic medication will outweigh the harm.

(5) That the recipient lacks the capacity to make a reasoned decision about the medication.

(6) That other less restrictive services have been explored and found inappropriate." 405 ILCS 5/2—107.1(d) (West 1994).

Respondent contends that the State failed to prove by clear and convincing evidence that he lacked the capacity to make a reasoned decision about the medication or that the benefits of the medication would outweigh its harm.

"Courts have defined 'clear and convincing' evidence most often as the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question. Although stated in terms of reasonable doubt, courts consider clear and convincing evidence to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense. [Citation.]" *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995). As a reviewing court, we give great deference to the trial court's factual findings because the court stands in the best position to weigh the credibility of all the witnesses; we therefore will not reverse a trial court's decision merely because we might have come to a different conclusion, but instead will reverse only if the trial court's decision is manifestly erroneous. *In re Jeffers*, 239 Ill. App. 3d 29, 35 (1992). A trial court's decision is not manifestly erroneous unless the error is clearly evident, plain, and undisputable. *Jeffers*, 239 Ill. App. 3d at 35.

When asked if respondent lacked the capacity to make a reasonable decision about the medication, Dr. Rohr simply responded, "Yes." The basis for his opinion was that respondent had marked deterioration and that he lacked awareness of his illness.

Respondent argues that such a response is insufficient, especially since Dr. Rohr seemed to equate respondent's "deterioration" with his "unemployment." Respondent further argues that the State is attempting to use the same evidence of deterioration to satisfy both the requirement of deterioration (section 2—107.1(d)(2)) and the requirement of incapacity (section 2—107.1(d)(5)). 405 ILCS 5/2—107.1(d)(2), (5) (West 1994). We disagree.

As the State points out, section 2—107.1(d)(2) sets forth three separate criteria for determining signs of mental illness. In addition to deterioration of function, suffering or threatening or disruptive behavior are also criteria. 405 ILCS 5/2—107.1(d)(2) (West 1994). Moreover, the fact that the symptoms of respondent's mental illness affect more than one of the criteria required before medication can be administered involuntarily does not render any of the elements

superfluous. The same deterioration of function that serves as proof of mental illness could also affect a respondent's inability to make a reasoned decision regarding what medication to take. However, the fact that a respondent evidences an inability to function does not necessarily prove an incapacity to make a reasoned decision as to medication. Different considerations will determine whether a particular criterion is present.

■ We do not believe that Dr. Rohr based his opinion of respondent's deterioration entirely on the fact that respondent was unemployed. There was evidence that respondent's unemployment stemmed from his delusion that other vehicles were emitting rays that were giving him headaches and that as a result he was afraid to drive his truck. According to Dr. Rohr, respondent's condition had been continuing for a year. Dr. Rohr received information from respondent's mother that outlined respondent's other delusions, as well as his thoughts of suicide, all of which culminated in the March 28, 1995, incident in which respondent displayed aggressive behavior toward his mother, blaming her for his problems and physically assaulting her.

Dr. Rohr's other basis, that respondent was unaware of his illness, also finds support in the record. Respondent argues that no one questioned him as to his reasons for refusing the medication. However, respondent himself testified that he did not suffer from any delusions and, although he stated that he had been on medication since his admission, he saw no need for him to receive medication.

In this case, the trial court found the testimony of Dr. Rohr and respondent's mother as to respondent's delusions, which caused his deterioration, more credible than that of the respondent, who denied having them. As we have previously stated, the determination of the credibility of the witnesses is the function of the trial court and, therefore, we will not disturb that determination.

Respondent further contends that, since there was no testimony as to the specific medication Dr. Rohr proposed to administer to respondent, the State failed to prove by clear and convincing evidence that the benefits of the medication outweighed its harms. Respondent maintains that section 2—107.1(d)(4) requires that the specific medication to be administered be identified. 405 ILCS 5/2—107.1(d)(4) (West 1994).

Dr. Rohr testified that respondent was in need of psychotropic medication and recommended that he receive antipsychotic medication of the safest kind and in the lowest dosage that would be effective. He further indicated that respondent would be monitored for side effects, which could be treated by medication.

■ We agree with the respondent that, without any evidence as to which medication Dr. Rohr proposed to administer, there is no way to determine whether the benefits of such medication outweigh the harm in administering it to the respondent. We note that in *In re Schaap*, 274 Ill. App. 3d 497 (1995), the respondent there challenged the proof of each element listed in section 2—107.1(d). In that case, the psychiatrist testified as to the effects of the prior medication administered to the respondent, that her new medication would cause fewer side effects, and concluded that the benefits of the new medication outweighed the harm caused by it. In *In re Jeffers*, 239 Ill. App. 3d 29 (1992), the psychiatric testimony set forth the specific type of psychotropic medication, the side effects the medication caused, and the psychiatrist's opinion that the benefits of the medication greatly outweighed the side effects.

While acknowledging that the available drugs differ in their side effects, the State argues that Dr. Rohr had good reasons not to specify a particular drug or amount. The State appears to argue that Dr. Rohr should not be limited to the use of one drug but should be able to switch respondent's medications based upon the respondent's reactions to the medications.

While such argument has some practical appeal, nevertheless, we believe that the requirements of section 2—107.1(d)(4) cannot be satisfied without the identification of the medication proposed to be involuntarily administered to a respondent. Otherwise, there can be no meaningful comparison of the benefits of the medication to the side effects the recipient might experience. The very general nature of Dr. Rohr's testimony, to wit, that respondent would be monitored for side effects, indicates that he had no idea as to what side effects respondent might experience upon the administration of such medication. Without such testimony, there is no evidence from which the trial court could determine that the benefits outweighed the harm of the medication.

In *Jeffers*, respondent contended that the State did not prove by clear and convincing evidence that the benefits of the medication outweighed the harm, since her psychiatrist testified only that they would, without providing a factual basis for that opinion. The reviewing court found that, in fact, the respondent's psychiatrist had provided a factual basis for his opinion. The reviewing court went on to hold that, even in the absence of a factual basis, where an expert's opinion went unchallenged, the expert's opinion provided *prima facie* proof that the benefits of the medication outweighed the harm, which the trial court could accept as clear and convincing if it found the expert to be credible. *Jeffers*, 239 Ill. App. 3d at 36-37.

We believe that *Jeffers* is distinguishable from the present case, in that in *Jeffers* the medication to be administered was identified, and the challenge was to the evidence of benefits versus harm. In the present case, without knowing what medication will be administered, there is no evidence as to what the benefits are or what the harm is to which the respondent will be exposed.

We conclude that the trial court erred in determining that the State had proved by clear and convincing evidence that the benefits of the psychotropic medication will outweigh the harm to respondent.

We now turn to the motion we ordered taken with this case. Respondent has requested that the court strike certain portions of the State's brief in this case in which, as part of its responsive argument to the above issue, the State "suggests" that the "interests of those adjudicated to be subject to involuntary commitment and ordered to take psychotropic medication might be better served if the Legal Advocacy Service intervened in such matters at the trial level instead of intervening only on appeal."

■ The State made a similar argument in *In re Carmody*, 274 Ill. App. 3d 46 (1995). We agree with the *Carmody* court that such "contention does not address the sufficiency of respondent's trial counsel in this case and would not automatically establish the effectiveness of trial counsel in another proceeding." *Carmody*, 274 Ill. App. 3d at 57-58.

As the State has failed to prove by clear and convincing evidence that the benefits of the medication would outweigh its harm to respondent, the trial court's decision ordering the involuntary administration of psychotropic medication to respondent must be reversed. Deciding this case as we do, we need not address the remaining issues raised by respondent.

The judgment of the circuit court is reversed.

Reversed.

BOWMAN and COLWELL, JJ., concur.