NO. 4-97-0261

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In The Matter of Bruce Perona )  Appeal from

a Person Found Subject to Involuntary   )  Circuit Court of

Admission, )  Peoria County

PEOPLE OF THE STATE OF ILLINOIS, )  No. 96MH294

Petitioner-Appel­lee, )  

v. )

BRUCE PERONA, )  Honorable

Respondent-Appellant )  Richard E. Grawey,

)  Judge Presiding. 

_________________________________________________________________

PRESIDING JUSTICE GARMAN delivered the opinion of the court:

In March 1997, respondent Bruce Perona was invol­un­tari­ly re­com­mit­ted to Zeller Men­tal Health Center (Zeller) after a hear­ing 
in
 
absentia
 conducted pursuant to section 3-806 of the Mental Health and De­vel­op­mental Dis­abili­ties Code (Code) (405 ILCS 5/3-806 (West 1996)).
  He ap­peals, argu­ing (1) the State failed to comply with section 3-806 of the Code; (2) the section is un­con­sti­tu­tional because it violates his right to due process under the United States and Illinois Constitutions (U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, §2); and (3) the cir­cuit court erred by entering a subsequent order pur­su­ant to sec­tion 2-107.1 of the Code (405 ILCS 5/2-107.1 (West 1996)), sub­ject­ing him to psy­cho­trop­ic medi­ca­tion against his will.  We af­firm.

I.  BACKGROUND

By way of background, on November 9, 1996, Perona was found naked in his car by police.  The police believed he was hal­luci­nat­ing and in need of psychiatric care.  They took him to Zeller, where he was ad­mit­ted.  On No­vem­ber 13, 1996, the trial court grant­ed the State's mo­tion to have Perona invol­un­tarily committed for 90 days.  On December 18, 1996, the trial court grant­ed the State's peti­tion to administer psy­cho­tropic medi­ca­tion involun­tarily.  On Feb­ruary 11, 1997, the State brought a petition for involun­tary recommit­ment.  Be­fore the hearing began, Perona's attorney noted Perona did not want to come and waived Perona's pres­ence on his behalf.  The hearing continued in Perona's ab­sence.  The court granted the peti­tion, and Perona was recom­mit­ted for anoth­er 30 days.

On March 7, 1997, the State filed the instant motion for in­vol­un­tary ad­mis­sion and recommitment.  Perona was given notice of the motion, and counsel was appointed before the peti­tion was heard on March 12, 1997.  He was also given notice of the instant motion to allow the State to administer psychotropic drugs to him against his will.  At the be­gin­ning of the hear­ing, Perona's coun­sel made the fol­lowing statement:

"I would like to indicate for the record that I visited with [Perona] yesterday.  He indi­cated that he would not want to at­tend the hearing.  I believe he did that last time also.  I spoke to him about the idea of con­solidating the two petitions, but we didn't get that far.  He said he didn't want to come to court.  I ask we proceed just on the one."

The involuntary recommitment hearing proceeded without Perona present.  According to Dr. Jayalakshmi Attaluri, a psy­chia­trist at Zeller, Perona suffers from psychosis, coupled with paranoia and auditory hallucinations.  Perona be­lieved peo­ple at Zeller were pro­vok­ing him by cough­ing or cross­ing their legs, thereby commu­ni­cating to him that he had to take off his clothes.  After hearing testimony from Attaluri, the trial court entered an in­voluntary recommitment order.

On March 19, 1997, the State's petition for involuntary medication was heard.  Perona was present and, as the hearing began, he started unbuttoning his shirt.  Attaluri told him he must not do that, and the judge told him that if he wanted to at­tend the hearing, he would have to remain clothed.  Perona stated "I don't want to attend it" and left the courtroom.  The hearing proceeded without Perona present.

According to Attaluri, Perona's illness resulted in a deterioration of his ability to function.  She tes­ti­fied Perona re­fused to talk to her; his delu­sions contin­ued, as did ac­compa­nying audi­tory hallu­cinations.  Attaluri tes­tified Perona de­nied he has a psy­chi­atric ill­ness and lacked the ability to make a reasoned deci­sion for him­self as to wheth­er it was in his best in­ter­est to take medica­tion.  

According to the doctor, Perona started demon­strating signs of de­pres­sion in addition to his psychoses.  Attaluri tes­tified an aide at Zeller  re­cently found Perona lying naked in his room, hoping some­one would come and "do something and then every­thing would be back to normal like *** he was four years ago."  Frequently in the past month, Perona has re­fused to eat.  For two weeks prior to the hear­ing, he had been eating at least a meal a day, but he was still losing a lot of weight.  Perona had been on an antide­pres­sant ear­lier, but Attaluri discontinued it once Perona stopped eating regular­ly because the drug caused hypoten­sion.

Attaluri testified Perona showed improvement in Janu­ary, when he was on Olanzapine, a neuroleptic drug that was crushed into his food, but his condition worsened when she start­ed giv­ing him the drug in pills.  Attaluri suspected he stopped tak­ing it.  Attaluri testified Perona's con­dition fluc­tu­ated, but this was accounted for by his fluctuating compli­ance with the medica­tion regimen.  Attaluri testi­fied Perona had been tak­ing medi­cation for 10 days prior to the hearing.  He showed no signs of im­prove­ment, but Attaluri testified this was be­cause of the delay be­fore the medica­tion takes effect.  The morning of the hearing the prior medica­tion order expired and Perona refused to take his medica­tion.  

Attaluri testified the benefits of psychotropic medica­tion would outweigh the side effects.  She had at­tempt­ed to treat Perona using out­pa­tient thera­py and both indi­vidual and group counsel­ing.  How­ev­er, she found medica­tion was neces­sary for Perona to im­prove.  Attaluri testi­fied she would be able to moni­tor for possi­ble harm or side ef­fects at the hos­pi­tal.  

Perona's attorney rested without presenting evidence.  The judge stated that the evidence was clear and con­vinc­ing, there was a need for administra­tion of psychotropic medi­cine, and the order would not ex­ceed 90 days.  Perona appeals both the March 12 and the March 19 or­ders.

II.  ANALYSIS

A.  The Recommitment Order

1.  
Compliance
 
With
 
Section
 
3-806

On appeal, Perona first argues the trial court failed to com­ply with section 3-806 because it did not find his atten­dance would sub­ject him to a substantial risk of serious physical or emotion­al harm.  Sec­tion 3-806 provides, in pertinent part:

"(a) The respondent shall be present at any hear­ing held under this Act unless his attor­ney waives his right to be present 
and
 
the
 
court
 
is
 
satisfied
 
by
 
a
 
clear
 
showing
 
that
 
the
 
respondent's
 
atten­dance
 
would
 
sub­ject
 
him
 
to
 
substantial
 
risk
 
of
 
serious
 
phys­ical
 
or
 
emo­tional
 
harm
.

"(b) *** If the recipient's attorney advises the court that the recipient refuses to at­tend, the hearing may proceed in his or her ab­sence.

"(c) No inference may be drawn from the recipient's non-atten­dance pursuant to either subsection (a) or (b) of this Section."  (Emphasis added.) 405 ILCS 5/3-806 (West 1996).

It is un­disputed that the trial court did not make a find­ing of substantial risk of harm, as required by section 3-806(a).  How­ev­er, this find­ing is not required by the text of sec­tion 3-806(b).  The comments of Perona's counsel at the March 12 hearing indicate this case falls squarely within this provision.  Section 3-806(c) dem­on­strates these two pro­vi­sions pro­vide dis­tinct meth­ods for a pro­ceeding to con­tinue in a respondent's absence.  Sec­tion 3-806(a) dem­on­strates the leg­is­la­ture knew how to im­pose a re­quire­ment of a finding of substantial harm and chose not to in cases where the respon­dent re­fuses to attend.  See 
Village of Southern View v. County of Sangamon
, 228 Ill. App. 3d 468, 473, 592 N.E.2d 639, 642 (1992) (where a partic­u­lar provision appears in a statute, the failure to in­clude that same require­ment in another section of the stat­ute will not be deemed to have been inadver­tent).

2.  
Constitutional
 
Challenge
 
to
 
Section
 
3-806

Citing this court's recent opinion in 
In re Branning
, 285 Ill. App. 3d 405, 674 N.E.2d 463 (1996), Perona next argu­es sec­tion 3-806 of the Code vio­lates both his pro­ce­dur­al and sub­stan­tive due pro­cess rights by allowing a hearing to continue in his absence without adequate assurances his waiver of the right to be present is voluntary.  While pro­ce­dur­al due pro­cess governs the methods by which a protected interest may be deprived, sub­stantive due process imposes absolute limits on the state's abil­ity to act without regard to any proce­dural protections in place.  
Collins v. City of Harker Heights
, 503 U.S. 115, 125, 117 L. Ed. 2d 261, 273, 112 S. Ct. 1061, 1068 (1992); 
Dennis E. v. O'Malley
, 256 Ill. App. 3d 334, 349, 628 N.E.2d 362, 373 (1993). 

We address only Perona's proce­dural due process claim.  Where a due pro­cess claim framed by a party in terms of sub­stan­tive due pro­cess is better resolved under proce­dural due process stan­dards, it is within the authori­ty of a court of re­view to re­structure its analysis ac­cord­ingly.  See 
Gasick v. O'Connor
, 201 Ill. App. 3d 1013, 1017, 559 N.E.2d 574, 577 (1990).  
Branning
 dealt with the con­sti­tu­tion­al­ity of a part of the Code that al­lowed a caregiver to give con­sent for a re­spon­dent to be sub­ject­ed to electrocon­vul­sive thera­py.  While our deci­sion in 
Branning
 re­lied in part on sub­stan­tive due pro­cess, that case implicated the fundamental substantive right to re­fuse psycho­tropic treat­ment.  
Branning
, 285 Ill. App. 3d at 411-12, 674 N.E.2d at 468, citing 
In re C.E.
, 161 Ill. 2d 200, 214, 641 N.E.2d 345, 351 (1994).  Here, by con­trast, Perona seeks addi­tion­al pro­ce­dur­al protections for waiver of his proce­dural right to be pres­ent.  While the proce­dural right to be present may re­late to the sub­stantive right to be free from unwanted treat­ment, Perona has presented no precedent or argu­ment as to this rela­tion­ship.  To the ex­tent Perona's claim aris­es under sub­stan­tive due pro­cess, Perona has waived the issue by fail­ing to brief it adequately.  155 Ill. R. 341(e)(7).

Perona's procedural due process argu­ment does not clear­ly indi­cate wheth­er his con­sti­tu­tion­al at­tack on sec­tion 3-806 is a facial attack or an attack on the statute as ap­plied to him.  However, the record does not demon­strate, and Perona does not allege, that his waiver of the right to attend was, in fact, involuntary.  Consequently, we as­sume Perona's con­sti­tu­tion­al attack is a facial one.  To sur­vive a fa­cial chal­lenge, the pro­ce­dures a stat­ute pro­vides must at least be ade­quate to autho­rize the lib­erty de­priva­tion with re­spect to some of the persons sub­ject to it.  
United States v. Salerno
, 481 U.S. 739, 751, 95 L. Ed. 2d 697, 711, 107 S. Ct. 2095, 2103 (1987); 
Branning
, 285 Ill. App. 3d at 412-13, 674 N.E.2d at 469.  The second district re­cently de­clared both sec­tions 3-806(a) and (b) fa­cial­ly uncon­stitu­tional on proce­dur­al due pro­cess grounds.  See 
In re Bar­ba­ra H.
, 288 Ill. App. 3d 360, 370-71, 680 N.E.2d 471, 478 (1997).

Barbara H.
 de­clared sec­tion 3-806(a) un­con­sti­tu­tion­al only after an ex­ten­sive analy­sis of per­tinent federal precedent.  See 
Barba­ra H.
, 288 Ill. App. 3d at 368-70, 680 N.E.2d at 476-78
, dis­cuss­ing 
Doremus v. Farrell
, 407 F. Supp. 509 (D. Neb. 1975), 
Suzuki v. Quisenberry
, 411 F. Supp. 1113, 1129 (D. Haw. 1976), 
Bell v. Wayne Coun­ty Gener­al Hospital
, 384 F. Supp. 1085 (E.D. Mich. 1974)
, and 
Kendall v. True
, 391 F. Supp. 413 (W.D. Ky. 1975).  Under this line of cases, due pro­cess re­quires a pa­tient to be pres­ent at a civil commit­ment hear­ing unless the right is intel­li­gently waived by himself and coun­sel (
Doremus
, 407 F. Supp. at 515), and may not be waived by a third party act­ing in what he per­ceives to be the best in­terest of the recip­ient (see 
Bell
, 384 F. Supp. at 1094).  The 
Barbara H.
 court also re­lied on the simi­lar holding in 
Branning
 (285 Ill. App. 3d 405, 674 N.E.2d 463).

However, the 
Barbara H.
 court's analysis of sec­tion 3-806(b) was less de­tailed.  The court simply in­cor­po­rated its consti­tu­tional anal­y­sis of sec­tion 3-806(a) and concluded sub­sec­tion (b) un­con­stitutionally al­lowed a com­mit­ment hear­ing to pro­ceed after a re­cipient refused to at­tend, with no show­ing the refusal was know­ing or intelli­gent.  
Barba­ra H.
, 288 Ill. App. 3d at 372-73, 680 N.E.2d at 479-80
.  For the reasons stated below, we dis­agree with the por­tion of 
Bar­ba­ra H.
 that in­vali­dates ­sec­tion 3-806(b).  
Un­like sec­tion 3-806(a) and the stat­u­to­ry pro­vi­sion at issue in 
Branning
, sub­sec­tion (b) does not au­tho­rize a third party to make deci­sions for the re­spondent.  In­stead, sec­tion 3-806(b) re­lates to a respondent's own actions, his refus­al to at­tend, as re­lated to the court through his coun­sel.  405 ILCS 5/3-806(b) (West 1996).

The Supreme Court of Illinois has ad­dressed the stan­dard for eval­u­ating facial attacks on procedural due process grounds since the decision in 
Barbara H.
.  
East St. Louis Fed­er­a­tion of Teach­ers Local 1220 v. East St. Louis School Dis­trict No. 189 Fi­nan­cial Over­sight Panel
, 178 Ill. 2d 399, 687 N.E.2d 1050 (1997).  In 
East St. Louis Federa­tion
, the court reject­ed an argu­ment that a stat­ute was facially unconsti­tutional because it failed to pro­vide mem­bers of a local school board with a hear­ing before they could be dis­missed by a govern­ment panel, even though the due process clause guaranteed them the right to a hearing.  
The court rea­soned that, even though the stat­ute did not require a hearing, the statute sur­vived a facial attack be­cause it did not bar the panel from con­ducting a hear­ing and, therefore, could operate con­stitutional­ly as to some school board members.  
East St. Louis Fed­er­a­tion
, 178 Ill. 2d at 421, 687 N.E.2d at 1063.

Given 
East St. Louis Federa­tion
, it is difficult to raise a succesful facial attack on a statute on procedural due pro­cess grounds.  As long as a statute allows a government body to pro­vide adequate protection for a constitu­tionally protected inter­est, it need not specifically mandate such protections in every case.  Further, reviewing courts are to pre­sume stat­utes are con­sti­tu­tion­al and will con­strue them so as to up­hold them when it is reason­ably possible to do so.  
Wil­son v. Depart­ment of Reve­nue
, 169 Ill. 2d 306, 310, 662 N.E.2d 415, 417 (1996).

De­cid­ing wheth­er a stat­utory pro­ce­dure comports with pro­ce­dural due pro­cess involves a three-part analy­sis:  first, we ask whether there exists a liberty or property interest that has been inter­fered with by the state; second, we examine the risk of an erro­neous deprivation of such an interest through proce­dures already in place, while considering the value of addi­tional safe­guards; and third, we examine the effect the adminis­trative and monetary burdens of additional procedures would have on the state's inter­est. 
 
Mathews v. Eldridge
, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903 (1976); 
East St. Louis Fed­er­a­tion
, 178 Ill. 2d at 415-16, 687 N.E.2d at 1060.

It has long been rec­og­nized that pro­ce­dur­al due pro­cess guaran­tees a respon­dent the right to be pres­ent at his hear­ing in or­der to pro­tect his liber­ty inter­est.  See 
Specht v. Patterson
, 386 U.S. 605, 610, 18 L. Ed. 2d 326, 330, 87 S. Ct. 1209, 1212 (1967).  How­ever, re­spon­dents may waive their con­sti­tu­tion­al rights.  
People v. John­son
, 75 Ill. 2d 180, 187, 387 N.E.2d 688, 691 (1979).  A waiv­er of consti­tution­al rights must be not only a vol­un­tary act, but also a know­ing, intel­ligent act done with suf­fi­cient aware­ness of the rele­vant cir­cumstances and like­ly conse­quences.  
Johnson
, 75 Ill. 2d at 187, 387 N.E.2d at 691, quoting 
Brady v. Unit­ed States
, 397 U.S. 742, 748, 25 L. Ed. 2d 747, 756, 90 S. Ct. 1463, 1469 (1970).

The risk of an erroneous deprivation of a respondent's right to be present is not high.  It is true that a party to a com­mit­ment pro­ceed­ing may have men­tal diffi­cul­ties that af­fect his ability to waive his consti­tu­tional rights.  However, parties are pre­sumed compe­tent until proved otherwise.  See 
Peo­ple ex rel. Drury v. Cath­o­lic Home Bu­reau
, 34 Ill. 2d 84, 95, 213 N.E.2d 507, 512-13 (1966)
.  This is true even if, as here, the respon­dent has been involun­tarily committed in the past but the com­mitment order has ex­pired.  See 
Drury
, 34 Ill. 2d at 95, 213 N.E.2d at 512-13.  

We must examine the risk of erroneous deprivation in the context of the procedural safeguards already ex­ist­ing in the statute.  
Mathews
, 424 U.S. at 541, 84 L.Ed. 2d at 503, 105 S. Ct. at 1492; 
East St. Louis Fed­era­tion
, 178 Ill. 2d at 419, 687 N.E.2d at 1061.  The Code pro­vides sev­er­al safe­guards to ensure a respondent's re­fus­al to attend is vol­un­tary.  The court must pro­vide the re­spon­dent per­son­al no­tice of his legal status and his right to counsel and a hear­ing.  405 ILCS 5/3-205 (West 1996).  Both the re­spon­dent and his at­tor­ney must be given notice of the time and place of the hear­ing.  405 ILCS 5/3-706 (West 1996).  The stat­utory right to coun­sel has been in­ter­pret­ed by this court to include a right to effec­tive as­sis­tance of coun­sel anal­ogous to the right to counsel guar­an­teed by the sixth amend­ment in crimi­nal proceed­ings.  
In re Carmody
, 274 Ill. App. 3d 46, 54-55, 653 N.E.2d 977, 983-84 (1995).  
In this fa­cial at­tack, we must as­sume these protections have been provid­ed and, accord­ingly, the at­tor­ney is act­ing in good faith, has informed his cli­ent of the con­se­quences of his deci­sion, and is mak­ing a truth­ful state­ment at the re­quest of his cli­ent.

Next we examine the specific procedure Perona seeks.  Perona would require the court to question the re­spon­dent re­gard­ing his desire not to attend or otherwise as­sure itself by per­sonal observation of the respondent that he is com­petent to make this decision.  The extra costs--to both re­spon­dents and the State--of this pro­cedure are high in com­par­ison to any addi­tion­al pro­tec­tion this would pro­vide.  This would effectively require any respon­dent to be present before he can waive his right to be present.  The compe­tent respondent's right to re­fuse to at­tend at all would be elim­inat­ed.  

More im­portant, requiring at­tendance at any point would en­cour­age--if not require--caregivers to phys­i­cally force an unwilling re­spon­dent to attend.  This would create a high risk of phys­ical inju­ry to the re­spon­dent and his caregivers, increase the cost of care, and infringe even fur­ther on the respondent's per­son­al lib­erty.  If the petition or rep­re­senta­tions of the respondent's counsel indi­cate these costs are war­rant­ed, the court clearly has the au­thor­i­ty to re­quire the respondent's at­tendance.  See 405 ILCS 5/3-706 (West 1996).  We cannot con­clude due pro­cess re­quires the respondent's presence in every case before a waiver is valid.

In 
In re Denby
, 273 Ill. App. 3d 287, 290-91, 653 N.E.2d 73, 75-76 (1995), this court held that, absent specific con­duct at a hear­ing dem­on­strating confu­sion or delusional thought process­es, a court could allow a re­spondent to waive his right to coun­sel at recom­mit­ment hear­ing with­out first question­ing him as to his capaci­ty.  This case is even more favorable to the state since it does not involve a 
pro
 
se
 liti­gant enti­tled to special protec­tion under the law.  See 
In re Click
, 196 Ill. App. 3d 413, 423, 554 N.E.2d 494, 500 (1990)
; 
Caruth v. Pinkney
, 683 F.2d 1044 (7th Cir. 1982).  

Alternatively, Perona would require input from a medi­cal profes­sional as to a respondent's ability to waive his rights.  The Code allows the court to appoint a physician to exam­ine the respondent and make a detailed report of his condi­tion.  See 405 ILCS 5/3-803 (West 1996).  However, requir­ing a report on the issue of capacity to waive the right to be present in every case would also cause great expense in exchange for lit­tle gain.  Again, respondents are presumed compe­tent, and a respondent's at­tor­ney may inform the court if he believes his client did not under­stand the notice or make an in­formed deci­sion.

The due pro­cess right to be pres­ent at a commitment proceeding has been referred to as closely related to the sixth amend­ment right to be pres­ent at a crim­i­nal trial.  See 
Bell
, 384 F. Supp. at 1094.  Under the sixth amend­ment, a defendant's re­fus­al to at­tend is enough to consti­tute a valid waiver of the right to be pres­ent, without any addi­tional showing the refusal was know­ing and intel­ligent.  See 
Taylor v. Unit­ed States
, 414 U.S. 17, 18-19, 38 L. Ed. 2d 174, 177, 94 S. Ct. 194, 194 (1973); 
People v. Owens
, 102 Ill. 2d 145, 156-57, 464 N.E.2d 252, 258 (1984).

We find no basis in this case for creating a higher standard for waiv­er of the due pro­cess right to be pres­ent at a hear­ing than for waiv­er of the sixth amend­ment right to be pres­ent at trial.  A civil commitment is nonpunitive and lasts only so long as is necessary to address a respondent's problems.  Because this is a lesser intrusion on the liberty of the respon­dent than a criminal conviction, it triggers lesser pro­cedural due process rights.  
United States v. Baker
, 45 F.3d 837, 844 (4th Cir. 1995).  Any argument that the respondent's mental prob­lems giving rise to the com­mit­ment proceeding may affect his abil­ity to make an informed, rational choice is negated by the pre­sump­tion of compe­tence and the court's power to allow addi­tional inqui­ry de­pend­ing on the nature of the petition.

Perona argues the sixth amendment cases are distin­guishable because he was never given an ad­mon­ish­ment that the hear­ing would go for­ward in his ab­sence even if he chose not to at­tend.  Though such an ad­monish­ment is re­quired by statute in criminal proceedings (725 ILCS 5/113-4(e) (West 1996); 
People v. Garner
, 147 Ill. 2d 467, 483, 590 N.E.2d 470, 477 (1992)), it is not re­quired as a con­stitutional matter (
Taylor
, 414 U.S. at 19-20, 38 L. Ed. 2d at 177-78, 94 S. Ct. at 195-96).

We stress that we are not holding additional assurances of a voluntary waiver of the right to be present are never re­quired by due pro­cess.  We only hold that the Code pro­vides suf­ficient safe­guards that the provi­sions al­lowing for waiver by refusal to attend are not fa­cially unconsti­tutional.

C.  The Medication Order

Perona also challenges the trial court order subjecting him to involuntary psychotropic medication under section 2-107.1 of the Code.  405 ILCS 5/2-107.1 (West 1996).  Perona first ar­gues an order under section 2-107.1 of the Code was premature because there was no showing that he in fact re­fused to ac­cept treatment.  Section 2-107.1 applies only when it is neces­sary to adminis­ter psycho­trop­ic medication to an adult against his will.  405 ILCS 4/2-107.1(a) (West 1996).  How­ev­er, Attaluri's un­con­test­ed tes­ti­mony was that Perona re­fused to take his medi­cation in the past and again the morning of the hearing, after the prior medication order had expired.

Perona next argues the evidence was insufficient to support the trial court's judgment.  Section 2-107.1 pro­vides, in per­ti­nent part:

"Psychotrop­ic medica­tion shall not be admin­is­tered to the recipient unless it has been determined by clear and convinc­ing evi­dence that all of the fol­lowing fac­tors are pres­ent:

(A) That the recipient has a seri­ous mental illness or develop­mental disability.

(B) That because of said men­tal illness or devel­opmen­tal dis­abil­ity, the recipient ex­hibits dete­riora­tion of his abil­ity to func­tion, suffering, or threatening or disrup­tive behav­ior.

(C) That the illness or dis­ability has exist­ed for a period marked by the continuing presence of the symp­toms set forth in item (B) of this subdivision *** or the repeat­ed epi­sodic occur­rence of these symp­toms.

(D) That the benefits of the psy­chotropic medica­tion will out­weigh the harm.

(E) That the recipient lacks the capacity to make a reasoned deci­sion about the medica­tion.

(F) That other less restric­tive services have been ex­plored and found inappropriate."  405 ILCS 5/2-107.1(a)(4) (West 1996).

Even though this sec­tion re­quires proof "by clear and con­vinc­ing evi­dence," great defer­ence is given to the trier of fact, and re­ver­sal is only warrant­ed when its deci­sion is mani­festly erro­ne­ous.  
In re Brazelton
, 245 Ill. App. 3d 1028, 1033, 615 N.E.2d 406, 408 (1993).  

We find no manifest error here.  The tes­ti­mo­ny of a sin­gle, un­con­test­ed ex­pert wit­ness, in con­junction with the recipient's own behav­ior in court, is suffi­cient to meet the State's burden of proof.  See 
Brazelton
, 245 Ill. App. 3d at 1033, 615 N.E.2d at 409.  Attaluri's tes­timo­ny that Perona had a seri­ous men­tal ill­ness related to all of the factors listed in sec­tion 2-107.1.  She tes­ti­fied non­medi­cal ser­vices such as coun­sel­ing had been at­tempted, but were unsuc­cessful.

The trial court could reasonably conclude Perona's ability to function had dete­riorated and that he was exhibiting disruptive behavior.  Perona's inability to remain both present and clothed demon­strat­ed this and Attaluri's testi­mony estab­lished this con­duct was recurring.  While Perona's conduct may not subject him to risk while inside Zeller, it can still be considered in de­ter­min­ing his overall ability to function.  See 
Brazelton
, 245 Ill. App. 3d at 1033, 615 N.E.2d at 409 (when assessing abil­ity to func­tion, court could con­sid­er prehospital-ization inci­dent in which recipi­ent re­spond­ed to delu­sions while driving by almost driving off a bridge).  More­over, Attaluri testified Perona was depressed and had stopped eat­ing regularly as well, demon­strating that his illness had begun to in­hibit his func­tioning within the hospital.  

Attaluri tes­tified the bene­fits of the medication out­weighed the harm.  For medical testimony to be clear and con­vinc­ing, it is sufficient if the expert indicates the basis of his diagnosis by having directly observed the recipient on sever­al occasions.  
In re Schaap
, 274 Ill. App. 3d 497, 502, 654 N.E.2d 1084, 1087 (1995).  A State expert's opin­ion need not in­clude fac­tu­al sup­port.  
In re Jeffers
, 239 Ill. App. 3d 29, 36-37, 606 N.E.2d 727, 732 (1992), 
aff'd
 
after
 
remand
, 
272 Ill. App. 3d 44, 47, 650 N.E.2d 242, 245 (1995).
  Perona at­tempts to un­der­cut Attaluri's tes­ti­mo­ny, ar­guing he had been tak­ing the medi­ca­tion for 10 days prior to the peti­tion and yet his condi­tion did not improve.  However, Attaluri also testi­fied the medi­cation did not take effect imme­diately and Perona's behav­ior had im­proved after prior extended use of Olanzapine.

Perona argues he was to be subjected to drugs dif­fer­ent from those he was subjected to in the past.  It is not neces­sary for a respondent to have tried a particular regimen of medi­cine before in order for his doctor to make a valid determina­tion its benefits would outweigh the harm it imposed.  See 
Schaap
, 274 Ill. App. 3d at 499, 654 N.E.2d at 1085.  The expert's opinion alone is 
prima
 
facie
 proof the bene­fits of a medication plan outweigh the harm.  
Jeffers
, 239 Ill. App. 3d at 36-37, 606 N.E.2d at 732.  How­ever, an order al­low­ing psy­cho­trop­ic drugs can­not be based on a new regi­men so poor­ly de­fined that the ex­pert could not have mean­ing­fully weighed the bene­fits and harm in­volved.  See 
In re Kness
, 277 Ill. App. 3d 711, 720-21, 661 N.E.2d 394, 399-400 (1996)
.

In this case, the trial court properly relied on Attaluri's opin­ion.  The regimen was not entirely new.  Perona had been on dif­fer­ent neuroleptic drugs be­fore, in­clud­ing Olanzapine, which Attaluri wanted to continue.  Perona had been on anti­de­pres­sants before.  The only aspect of Attaluri's pro­posed regimen that was entirely new was a sec­ond drug, ei­ther Prolixin or Haldol.  While Attaluri did not specify which drug would be used, she did narrow it down to those two, both neuro­leptic drugs, and Perona present­ed no evidence they had different side effects.  Attaluri tes­ti­fied that two neuroleptic drugs were used to­geth­er on rare occa­sions be­cause they were more ef­fective to­geth­er.  There was no evi­dence of any po­tential nega­tive in­ter­ac­tion ef­fects be­tween the medica­tions in the new regi­men.

Attaluri testified Perona lacked the capacity to make a reasoned decision regarding administration of psychotropic medi­cation.  The record supports a finding that Perona did not un­der­stand the benefits of treatment.  Attaluri tes­ti­fied Perona no lon­ger ac­knowl­edged he had a mental illness, did not believe his hallu­ci­nations or un­healthy eating habits were a problem, and refused to talk about them.  See 
Kness
, 277 Ill. App. 3d at 719, 661 N.E.2d at 399 (recipient lacked ability to make rea­soned deci­sions about medi­cation, partially because he did not acknowl­edge he was suffering from mental illness).  Perona did not pres­ent any ra­tio­nal ex­pla­na­tion for his re­fus­al to take the medica­tions.  
Cf
. 
In re Isra­el
, 278 Ill. App. 3d 24, 39, 664  N.E.2d 1032, 1041 (1996)
.

III.  CONCLUSION

For all of the reasons stated, we affirm.

Affirmed.

GREEN and STEIGMANN, JJ., concur.